## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CENTILLION DATA SYSTEMS, LLC, | : |
| | :    C.A. No. 05-712 |
| Plaintiff, | : |
| | :    Jury Trial Demanded |
| v. | : |
| | : |
| AVOLENT, INC., | : |
| | : |
| Defendant. | : |
| | : |

## CENTILLION DATA SYSTEMS, LLC'S ANSWERING BRIEF
## IN OPPOSITION TO AVOLENT, INC.'S MOTION TO STAY ACTION
## PENDING REEXAMINATION OF THE '270 PATENT

### BLANK ROME LLP

Dale R. Dubé (I.D. No. 2863)
Michelle A. Bimson (I.D. No. 4381)
1201 Market Street, Suite 800
Wilmington, DE 19801
(302) 425-6400
dube@blanrkome.com
bimson@blankrome.com

OF COUNSEL:

Grant S. Palmer
BLANK ROME LLP
One Logan Square
Philadelphia, PA 19103
(215) 569-5500

Michael C. Greenbaum
Joel R. Wolfson
Denise Lane-White
BLANK ROME LLP
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 772-5800

Attorneys for Plaintiff

Dated: November 23, 2005

## TABLE OF CONTENTS

I.     BRIEF OVERVIEW ..................................................................................................................... 1

II.    THE FEDERAL COURT IN INDIANA HAS ALREADY ADDRESSED
       WHETHER THIS REQUEST FOR REEXAMINATION WARRANTS
       A STAY OF LITIGATION RELATED TO THE '270 PATENT ........................................... 2

III.   THE DISTRICT COURT SHOULD DENY AVOLENT'S MOTION
       FOR A STAY ............................................................................................................................. 4

       A.    A STAY WOULD PREJUDICE CENTILLION AND UNJUSTLY
             BENEFIT AVOLENT .................................................................................................... 5

       B.    THE REEXAMINATION WILL NOT NECESSARILY SIMPLIFY
             THE ISSUES IN QUESTION OR THE TRIAL OF THIS CASE ............................. 6

             1.    The Reexamination Will Not Necessarily Impact All of the Claims
                   of the '270 Patent .............................................................................................. 6

             2.    The Reexamination Request Does Not Disclose Prior Art that Will
                   Invalidate Any Claim of the '270 Patent and Will Not Narrow the Issues
                   Before the Court ................................................................................................. 8

             3.    Discovery is Inevitable ...................................................................................... 10

IV.    CONCLUSION AND RELIEF REQUESTED ..................................................................... 11

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Ethicon Inc. v. Quigg,*
   849 F.2d 1422 (Fed. Cir. 1988)............................................................................................4, 7

*Gould v. Control Laser Corp.,*
   705 F.2d 1340 (Fed. Cir. 1983).................................................................................................4

*H.H. Robertson Co. v. U. Steel Deck, Inc.,*
   820 F.2d 384 (Fed. Cir. 1987)..................................................................................................5

*Landis v. N. America Co.,*
   299 U.S. 248 (1936)..................................................................................................................4

*Markman v. Westview Instruments,Inc.,*
   52 F.3d 967 (Fed. Cir. 1995)....................................................................................................5

*In re Paulsen,*
   30 F.3d 1475 (Fed. Cir. 1994)..................................................................................................9

*Wayne Automation Corp. v. R.A. Pearson Co.,*
   782 F.Supp. 516 (E.D. Wash. 1991).......................................................................................7

*Xerox Corp. v. 3Com Corp.,*
   69 F.Supp. 2d 404 (W.D.N.Y. 1999) ...............................................................................4, 5, 7

### FEDERAL STATUTES

35 U.S.C. §515 ............................................................................................................................7

### UNREPORTED CASES

*Centillion Data Systems, LLC v. Convergys Corp.,*
   2005 WL 2045786 (S.D. Ind. Aug. 24, 2005)...........................................................................3

*Bacus Labs., Inc. v. Aperio Techs., Inc.,*
   2005 WL 475158 (N.D. Ill. Mar. 1, 2005)..............................................................................10

*Cognex Corp. v. Nat'l Instruments Corp.,*
   2001 WL 34368283 (D. Del. 2001)..........................................................................................4

*Enprotech Corp. v. Autotech Corp.,*
   1990 WL 37217 (N.D. Ill. 1990) ...........................................................................................10

*Pegasus Dev. Corp. v. DirecTV, Inc.,*
   2003 WL 21105073 (D. Del. May 14, 2003)............................................................................4

Centillion Data Systems, LLC and CTI Group (Holdings), Inc. (collectively "Centillion") hereby oppose Avolent's motion to stay this action.

## I.    BRIEF OVERVIEW

Prior to Centillion's initiation of its patent-infringement lawsuit against Avolent, Centillion sued Qwest in Indiana for infringement of the same patent. Qwest, in one of a series of procedural roadblocks, filed a feeble petition for reexamination in the Patent Office.[1] Based on the then as-yet-granted reexamination, Qwest moved for a stay. The Indiana court denied Qwest's motion, explaining that "[a]lthough the Court agrees that the statistics suggest that reexamination is more probabl[e] than not, *there is no requirement that the PTO's inquiry will lead to adjustment of the claims or a finding of invalidity*." Exhibit 1: S.D. Ind. Order Denying Qwest's Motion for a Stay, dated June 13, 2005, p. 3.

After the Patent Office granted reexamination of the three independent claims of the patent, Qwest renewed its motion for a stay. Again, the Indiana Court denied Qwest's motion, stating that "*the timing of Qwest defendants challenge of the '270 patent before the PTO also indicates that this request for a stay may be more of a dilatory tactic than one of necessity*." Exhibit 2: S.D. Ind. Order Denying Qwest's Renewed Motion for a Stay dated August 24, 2005, pp. 2-3, *also available at* 2005 WL 2045786, at *1 (S.D. Ind. Aug. 24, 2005).

The reexamination request was based on a scant two-page press release which by any objective standard does not disclose a series of facts vital to the patented invention. The reexamination was requested for only the three independent claims of the '270 patent – an apparent

---

[1] The reexamination petition was filed in the name of a law firm and did not disclose to the Patent Office either the real party in interest. In its motion papers, Qwest implied that it was, in fact, the petitioner by notifying Centillion – before the Patent Office notified Centillion – that a petition had been filed and by filing a copy of the publicly-unavailable petition with this Court. Centillion has explained as much to the Indiana court, and Qwest has never denied that it, in fact, filed the reexamination request.

admission that the prior art did not impact the eighty-two independent claims of the patent. Exhibit 3: Request for Ex Parte Reexamination Transmittal Form, p. 1. And though the Patent Office could have ordered reexamination proceed for all eighty-five claims of the patent, the order granting reexamination cited only the three independent claims. Exhibit 4: Order Granting Request for Ex Parte Reexamination, p. 1. The reexamination, therefore, addresses only the validity of the three independent claims of Centillion's '270 Patent, and which does not question the validity and scope of the remaining eighty-two dependent claims in the patent.

Avolent's stay request is based on that same reexamination. Avolent has not, however, carried its burden of showing that it will suffer a clear case of hardship should this litigation proceed. Indeed, even if the Patent Office modifies or cancels the '270 patent's three independent claims (which is highly unlikely), the inequity and unjust hardship to Centillion resulting from a stay clearly outweighs the arguments in support thereof. As set forth below, Avolent has not shown that the reexamination will, *in fact*, have any impact on this suit. Moreover, substantial discovery is inevitable regardless of the remote possibility of an outcome favorable to Avolent in the Patent Office. A stay would impose injustice upon Centillion.

For these and the other reasons described in this memorandum, Centillion respectfully requests that this Court deny Avolent's motion.

## II.   THE FEDERAL COURT IN INDIANA HAS ALREADY ADDRESSED WHETHER THIS REQUEST FOR REEXAMINATION WARRANTS A STAY OF LITIGATION RELATED TO THE '270 PATENT

The genesis of the reexamination proceeding – as a dilatory tactic by an accused infringer in a similar case in Indiana – is a significant factor in the calculus of deciding Avolent's motion for a stay.

In January 2004, Centillion instituted a patent-infringement suit in the Southern District of Indiana against, among others, several Qwest entities. Qwest responded with procedural

2

gamesmanship. Qwest moved to dismiss Centillion's Indiana suit for lack of personal jurisdiction

and filed a declaratory-judgment suit against Centillion in Washington. On Centillion's motion, the

Washington district court dismissed Qwest's complaint and transferred its action to Indiana.

Eventually, Qwest withdrew its motion to dismiss Centillion's Indiana complaint and consented to

personal jurisdiction before the Indiana court.

In July 2004, Centillion served Qwest with discovery requests. Qwest failed to respond. In

April 2005, Centillion served additional discovery requests. In early May 2005, Qwest orchestrated a

petition for reexamination of the patent-in-suit. A week later and one business day before Qwest's

discovery responses were due – based only on the then yet-to-be-granted reexamination – Qwest

moved the Indiana Court for a stay of all litigation proceedings. The Court denied the motion,

stating:

> A stay at this stage of the litigation will only serve to delay the time for the parties to
> conduct discovery … . [I]t is likely a stay in this case could push out discovery for an
> additional eighteen months. … Although the Court agrees that the statistics suggest
> that reexamination is more probabl[e] than not, ***there is no requirement that the
> PTO's inquiry will lead to adjustment of the claims or a finding of invalidity***.

Exhibit 1, pp. 2-3  (emphasis supplied).

Qwest renewed its motion for reexamination, based on the fact that the Patent Office had

granted the reexamination. Again, the Court denied the motion:

> This cause has been delayed for over eighteen months because Qwest defendants
> fought jurisdiction in this cause. Although the Court cannot fault a party for making
> a legitimate challenge to jurisdiction, the transfer to this Court [of] Qwest
> defendants' parallel action from the Western District of Washington, begs the
> question of whether or not Qwest defendants had a legitimate challenge to such
> jurisdiction. Moreover, ***the timing of Qwest defendants challenge of the '270
> patent before the PTO also indicates that this request for a stay may be more
> of a dilatory tactic than one of necessity***.

*Centillion Data Systems, LLC v. Convergys Corp.*, 2005 WL 2045786, at *1 (S.D. Ind. Aug. 24, 2005)

(emphasis supplied).

3

## III. THE DISTRICT COURT SHOULD DENY AVOLENT'S MOTION FOR A STAY

The decision to stay litigation is within the discretion of the district court. *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1341 (Fed. Cir. 1983). In addition, the Federal Circuit has recognized that a district court may properly stay proceedings in a patent case pending the Patent Office's reexamination of a patent-in-suit. *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988) ("Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted).

Case law sets forth three elements that courts should consider when deciding whether to stay patent litigation during reexamination of the patent-in-suit:

(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party;

(2) whether a stay will simplify the issues in question and trial of the case; and

(3) whether discovery is complete and whether a trial date has been set.

*Pegasus Dev. Corp. v. DirecTV, Inc.*, 2003 WL 21105073, at *1, quoting *Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999) (citing cases). "In balancing these factors, courts must be particularly mindful of the consequences of the stay on other parties." *Cognex*, 2001 WL 34368283, at *2. As applied to the facts of this case, consideration of the three elements recommends against a stay pending a Patent Office decision on the reexamination.

The **burden is on the party seeking the stay** to show "a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936), *cited in Output Tech. Corp. v. Dataproducts Corp.*, 1991 WL 332547 (W.D. Wash. 1991) (denying stay pending patent reexamination); *accord Cognex Corp. v. Nat'l Instruments Corp.*, 2001 WL 34368283, *2 (D. Del. 2001) ("the Court cannot conclude that Cognex has demonstrated a clear case of hardship or inequity justifying a stay [pending reexamination] in this case"). Not only does Avolent neglect to mention

4

its burden of proving the necessity of a stay, its motion papers are devoid of any evidence that Avolent will suffer "a clear case of hardship or inequity" if this litigation proceeds.[2]

On the other hand, Centillion will suffer undue prejudice if a stay is granted. The weight of the competing interests strongly favors denial of the requested stay. As such, this Court should deny Avolent's motion to stay with prejudice.

## A.    A STAY WOULD SERIOUSLY PREJUDICE CENTILLION AND UNJUSTLY BENEFIT AVOLENT

A stay will prejudice Centillion's equitable rights under the patent laws. The patent statute grants patent owners, such as Centillion, the right to exclude others from making, using, offering for sale, or selling the patented invention for a set statutory period – in this case, through 15 February 2011, seventeen years from the date the patent issued. Although Centillion seeks monetary damages from Avolent, Centillion also seeks to enjoin Avolent from utilizing the technology claimed in the '270 patent. Thus, monetary damages cannot wholly compensate Centillion for infringement of its right to exclude others. *See, e.g.*, *H.H. Robertson Co. v. U. Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987), *abrogated on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ("The nature of the patent grant thus weighs against holding that monetary damages will always suffice to make the patentee whole, for the principal value of a patent is its statutory right to exclude.").

The reexamination proceeding could last for years – severely cutting into the remaining six-year life of the '270 patent. *See, e.g., Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404, 407 (W.D.N.Y. 1999) ("Plaintiff points to the average time for reexamination, 19.2 months, which does not account

---

[2] The Court should not allow Avolent to raise for the first time in its reply brief any evidence of alleged hardship or inequity. As the moving party, Avolent was obligated to present all of its legal contentions and supporting authorities in its main brief so that Centillion would have an adequate opportunity to prepare an appropriate response – particularly where, as here, the local rules do not provide Centillion with the right to file a sur-reply.

5

for the time for any appeal taken by the patentee pursuant to 35 U.S.C. § 306. At oral argument,

counsel ... conceded that the delay could be at least one year, even with the PTO's expedited

attention if there were a stay. Thus, the delay involved would likely be at least one year and could

easily exceed two years."). Under the patent laws, there is no means for compensating Centillion for

the period of exclusivity it will lose during any stay pending reexamination. In addition, after such a

passage of time, Centillion's prayer for relief to enjoin Avolent from further infringement may have

diminished value as technology and market conditions may change.

A stay may also prejudice Centillion's ability to discover evidence relevant to proving its case.

For example, Avolent's website lists twelve separate companies as "software partners." Exhibit 5:

http://www.avolent.com/03relationships/partners.htm. It is possible that Avolent's accused

software was created in whole or in part through outsourcing to one or more of these third-party

software partners.[3] Without appropriate subpoenas and discovery requests in place, during the

pendency of any reexamination and stay, those third parties may unknowingly spoil evidence related

to the creation of Avolent's infringing product.

## B.    THE REEXAMINATION WILL NOT NECESSARILY SIMPLIFY THE ISSUES IN QUESTION OR THE TRIAL OF THIS CASE

### 1.    The Reexamination Will Not Necessarily Impact All of the Claims of the '270 Patent

Avolent relies on statistics and guess work to support its arguments about the potential legal

redundancies and simplification of issues at trial. It should be noted, however, that the Patent

Office and the courts conduct different validity inquiries. As the *Xerox* court explained:

---

[3] The need to prevent inadvertent spoliation by third parties is real. The manner in which Avolent developed its software may be probative of the issue of willfulness and infringement, especially under the doctrine of equivalents. The persons that developed the software may be the only ones that truly understand how that software is operating and whether a difference between the claim and product is insubstantial.

6

It bears mentioning that the inquiries of the PTO on reexamination and the issues before the district court in an infringement action are quite distinct. As the Federal Circuit has recognized, "the awkwardness presumed to result if the PTO and court reach different conclusions is *more apparent than real*. The two forums take different approaches in determining invalidity and on the same evidence could quite correctly come to different conclusions." *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1428 (Fed. Cir. 1988).

69 F. Supp. 2d at 407 (emphasis supplied). As explained by another district court:

[I]t would be entirely reasonable that the two forums might reach opposite conclusions regarding a patent's validity because (1) the forums take different approaches in determining invalidity and on the same evidence could quite correctly come to different conclusions, (2) a court's decision is likely to be based on a more complete record, (3) district court litigation may include challenges to validity which the PTO cannot consider, and (4) the two forums have different standards of proof for determining invalidity.

*Wayne Automation Corp. v. R.A. Pearson Co.*, 782 F. Supp. 516, 519 (E.D. Wash. 1991). Indeed,

nothing prevents Avolent from making invalidity arguments to this Court based on the same prior

art presented to the Patent Office during the reexamination – even if the Patent Office rejected

those arguments. As affirmative defenses to Centillion's patent-infringement suit, Avolent states

that it will "likely" assert invalidity based on anticipation and obviousness. Thus, it is clear that

Avolent intends to argue before this Court that *all* of the claims of the '270 patent are invalid

regardless of the outcome of the reexamination.

Reexamination will not dispose of all of the invalidity issues this Court will be asked to

address. For those and the following reasons, Avolent's requested stay will not simplify the issues

raised in this litigation.

The '270 patent is valid and enforceable. The Patent Office has not rejected any claim of the

'270 patent as invalid over the reexamination prior art.[4] Though Avolent attempts to gloss over that

---

[4] The standard applied by the Patent Office in granting the reexamination was whether there was a "substantial new question of patentability," not whether the claims lacked patentability. 35 U.S.C. §515(a).

7

fact through the citation of statistics, until such time as the Patent Office actually rejects a claim of the '270 patent -- *if* it does -- Avolent's motion for a stay is premature.

The reexamination proceeding only addresses the validity of the three *independent* claims of the '270 patent. The initial request recommended the reexamination of the three independent claims. Although the Patent Office could have issued an order granting reexamination of all eighty-five claims of the '270 patent, the order merely states that a question of patentability was raised as to the independent claims. Even assuming *arguendo* that the Patent Office rejects those three claims, that administrative proceeding would not necessarily have *any* impact on the validity or scope of the remaining eighty-two dependent claims (which, as a matter of law, are presumed valid). Accordingly, Centillion could arguably prosecute this case against Avolent for its infringement of any number of the '270 patent's eighty-two dependent claims.

### 2. The Reexamination Request Does Not Disclose Prior Art that Will Invalidate Any Claim of the '270 Patent and Will Not Narrow the Issues Before the Court

The prior-art references in the reexamination request are not more relevant than the *twelve* prior art references[5] the Patent Office considered during the prosecution of the '270 patent. The petition for reexamination was based on a two-page press release from the June 22, 1988 edition of "Network World" ("Press Release") that announces that Texas Instruments ("TI") "will begin a trial … to have its telephone bills delivered by [Electronic Data Interchange standard protocol]" from Southwestern Bell Telephone. The Press Release also notes that "[i]nitially, only billing summaries will be sent, with detailed bills transmitted later in the year, or early next year." The reexamination petition that when this "new" prior art is combined with a prior-art reference that had been cited during the prosecution of the patent, all of the elements found in the three independent claims of

---

[5] The references considered by the Patent Office are listed on the first page of the '270 patent and include four U.S. patents, one United Kingdom patent, and seven additional publications.

8

the patent would have been obvious to one of ordinary skill and concluded that those three claims are invalid.

For many reasons, the reexamination will not result in the cancellation of any of the '270 patent's claims. Most importantly, the reexamination petition asserted that the Press Release discloses a series of vital facts that it does not, in fact, describe. For example, the petition asserted that the Press Release discloses a transfer of data from a mainframe to a personal computer; in fact, it does not describe what kinds of computers are being used. Given the state of computers at the time and the massive amounts of data involved, persons skilled in the art would likely interpret the document as disclosing the transfer of data between the two mainframes, and not a transfer to a PC or personal computer processing network, as the patent requires. The petition also asserted that the Press Release describes the information as being put into "a format for storage, manipulation and display on a personal computer"; in fact, it does not describe the format being used.

The reexamination will also fail because neither the press release alone, nor it in combination with the previously cited prior art, discloses several necessary elements claimed in the patent. For example, the '270 patent's claims require that a PC performs additional processing on "individual transaction records which have been at least in part preprocessed by said data processing means utilizing said summary reports for expedited retrieval of data, to present a subset of said selected records including said exact charges actually billed to said user." What the Press Release describes is merely a presentment of some kind of rudimentary billing summaries, not the kind of "summary reports" required by the '270 patent. This is not what the patent requires, and the subject matter claimed in the patent should not be considered obvious in view of the cited reference.

Based on these and other deficiencies, the Patent Office should not be allowed to rely on the Press Release alone. *See In re Paulsen*, 30 F.3d 1475, 1478-79 (Fed. Cir. 1994) ("A rejection for anticipation … must be enabling and describe the applicant's claimed invention sufficiently to have

9

placed it in possession of a person of ordinary skill in the field of the invention."). Thus, Centillion would not have to make any arguments that would affect the scope and meaning of the '270 patent claims.

The standard for instituting a reexamination (a "substantial new question of patentability") is *lower* than the standard for rejecting claims as being unpatentable. Accordingly, the patentability of the claims of the '270 patent will be confirmed based on, *inter alia*, the foregoing arguments.

## 3.    Discovery is Inevitable

The parties have not begun discovery, nor has a trial date been set. Substantial discovery is unavoidable, however, regardless of the remote possibility of an outcome favorable to Avolent in the Patent Office. Regardless of the reexamination proceeding, Centillion will need to take discovery on Avolent's development of its accused software, knowledge of Centillion's patents, claim interpretations, and the prior art on which it intends to rely to make its invalidity arguments. *See, e.g.*, Exhibit 1: S.D. Ind. Order Denying Qwest's Motion for a Stay, p. 3 ("[I]f the PTO reexamination leads to a narrowing of the claims at issue, the progress of discovery in this case will only have enhanced judicial economy.").

Notwithstanding Avolent's assertions that reexamination "could" or will "likely" or "may" impact the claims of the '270 patent, as set forth above, many triable issues will remain regardless of the reexamination of three of the eighty-five claims of the '270 patent. *Bacus Labs., Inc. v. Aperio Techs., Inc.*, 2005 WL 475158, *17 (N.D. Ill. March 1, 2005) ("the better course is to proceed to conclude discovery in the case, leaving open the option of revisiting the issue of a stay if and when the case approaches trial"). Under these circumstances, a stay is not warranted. *See, e.g.*, *Enprotech Corp. v. Autotech Corp.*, 1990 WL 37217 (N.D. Ill. 1990) (denial of stay based in part on fact that Patent Office reexamination would likely not resolve all issues before the court).

10

## IV.    CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Centillion respectfully request that this Court deny Avolent's

motion for a stay pending the conclusion of the reexamination of the '270 patent.

### BLANK ROME LLP

By: _____

Dale R. Dubé (I.D. No. 2863)
Michelle A. Bimson (I.D. No. 4381)
1201 Market Street, Suite 800
Wilmington, DE 19801
(302) 425-6400
dube@blanrkome.com
bimson@blankrome.com

OF COUNSEL:

Grant S. Palmer
BLANK ROME LLP
One Logan Square
Philadelphia, PA 19103
(215) 569-5500

Michael C. Greenbaum
Joel R. Wolfson
Denise Lane-White
BLANK ROME LLP
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 772-5800

Attorneys for Plaintiff

Dated: November 23, 2005

Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CENTILLION DATA SYSTEMS, LLC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:04-cv-00073-LJM-WTL |
| | ) | |
| CONVERGYS CORPORATION, QWEST | ) | |
| COMMUNICATIONS INTERNATIONAL, | ) | |
| and | ) | |
| QWEST CORPORATION, | ) | |
| Defendants, | ) | |
| ------------------------------------------------ | ) | |
| QWEST CORPORATION and QWEST | ) | |
| COMMUNICATIONS CORPORATION, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CENTILLION DATA SYSTEMS, LLC., and | ) | |
| CTI GROUP (HOLDINGS), INC., | ) | |
| Defendants. | | |

**ORDER ON DEFENDANTS' MOTION TO STAY**

This cause is now before the Court on defendants', Qwest Communications International,

Qwest Corporation, and Qwest Communications Corporation (collectively "Qwest"), Motion to Stay

the proceedings in this cause pending resolution of an Ex Parte Request for Re-Examination of the

'270 Patent filed by Qwest in the United States Patent and Trademark Office ("PTO"), on May 5,

2005. Plaintiff, Centillion Data Systems, LLC ("Centillion") opposes the motion.

For the following reasons, the Court **DENIES** Qwest's Motion to Stay.

**I. DISCUSSION**

Qwest contends that a stay is appropriate in this case because the PTO will almost certainly

grant Qwest's reexamination request, and judicial economy and conservation of resources weigh in favor of waiting for reexamination before this infringement action proceeds. Centillion argues that a stay is unwarranted at this time because the PTO has not yet granted Qwest's request for reexamination, and because the stay would unduly prejudice Centillion. Centillion contends that the basis for Qwest's request to reexamine the patent is specious and motivated by dilatory tactics rather than good faith, therefore, it is not "almost certain" that the PTO would grant Qwest's request for reexamination. In addition, Centillion avers that it would be prejudiced by any further delay in litigation of its infringement claims against Qwest, litigation that has already been delayed unduly by Qwest's other procedural motions.

The parties agree that the Court should consider the following factors to make a ruling on Qwest's motion: (1) whether a stay will unduly prejudice or tactically disadvantage the non-moving party; (2) whether a stay will simplify the issues in question and streamline the trial; and (3) whether a stay will reduce the burden of litigation on the parties and the Court. *See Xerox Corp. v. 3 Com Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999) (citations omitted). In this case, the Court finds that the factors weigh in favor of denying the stay. A stay at this stage of the litigation will only serve to delay the time for the parties to conduct discovery - discovery that Qwest admits in its reply that it would like to accomplish as well. In addition to its prior challenges to Centillion's claims, Qwest now contends that Centillion's complaint was filed without the requisite inquiry into the underlying facts as required by Federal Rule of Civil Procedure 11 ("Rule 11"). Centillion has waited nearly a year-and-a-half to commence discovery, it is likely a stay in this case could push out discovery for an additional eighteen months. As Centillion points out, further delay will not be conducive to inadvertent spoliation of evidence by the parties or by non-party interests who have

2

relevant information.

Furthermore, Qwest presents no evidence, other than its own statistical assessment, that the PTO is likely to require Centillion to change its claims. Although the Court agrees that the statistics suggest that reexamination is more probable than not, there is no requirement that the PTO's inquiry will lead to adjustment of the claims or a finding of invalidity. Moreover, if the PTO reexamination leads to narrowing of the claims at issue, the progress of discovery in this case will only have enhanced judicial economy.

In addition, Qwest has stated that it is interested in filing a Rule 11 motion. If the Court were to grant a stay, that motion would also be delayed while the PTO decided whether or not to grant Qwest's request for reexamination, and then conducted the reexamination if it is granted. It hardly seems efficient to postpone such a motion on the hope that the PTO will invalidate a patent it has already found valid. Furthermore, Qwest has raised issues of invalidity in the instant case and there is little chance that this Court would rule on those issues prior to the PTO's grant of Qwest's request for reexamination at least, and possibly not before the PTO makes findings on such reexamination.

In light of these findings, the Court cannot agree with Qwest that granting a stay now will reduce the burden of litigation on the parties or the Court. Qwest's Motion to Stay is **DENIED**. The Court will not, however, prohibit Qwest from renewing its request if the circumstances of the reexamination change in any way that may change the balance of these factors.

Qwest has also objected to Magistrate Judge Lawrence's denial of Qwest's Motion for Enlargement of Time to Respond to Discovery. Because the Court has now also denied Qwest's Motion to Stay, the Court finds that Magistrate Judge Lawrence properly denied Qwest's Motion for Enlargement of Time. Qwest's Objection to Order Denying Motion for Enlargement of Time

3

to Respond to Discovery is **OVERRULED**, except as modified by this order. Parties are hereby
ordered to respond to outstanding discovery requests on or before July 8, 2005.

## II. CONCLUSION

For the foregoing reasons, defendants', Qwest Communications International, Qwest
Corporation, and Qwest Communications Corporation, Motion to Stay is **DENIED** and the same
entities' Objection to Order Denying Motion for Enlargment of Time to Respond to Discovery is
**OVERRULED**. Parties shall respond to outstanding discovery requests on or before July 8, 2005.

IT IS SO ORDERED this ___ day of June, 2005.

LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

4

Electronically distributed to:

Vincent J. Belusko
MORRISON & FOERSTER LLP
vbelusko@mofo.com

David C. Campbell
BINGHAM MCHALE LLP
dcampbell@binghammchale.com

Hamish S. Cohen
BINGHAM MCHALE
hcohen@binghammchale.com

James Dimos
LOCKE REYNOLDS LLP
jdimos@locke.com

Hector G. Gallegos
MORRISON & FOERSTER LLP
hgallegos@mofo.com

Michael C. Greenbaum
BLANK ROME, LLP
greenbaum@blankrome.com

Edward Han
HOWREY SIMON ARNOLD & WHITE
LLP
hane@howrey.com

Denise Catherine Lane-White
BLANK ROME, LLP
lane-white@blankrome.com

Grant S. Palmer
BLANK ROME, LLP
palmer@blankrome.com

Randall R. Riggs
LOCKE REYNOLDS LLP
rriggs@locke.com

James W. Riley Jr.
RILEY BENNETT & EGLOFF LLP
jriley@rbelaw.com

Hemant Keeto Sabharwal
BLANK ROME LLP
sabharwal@blankrome.com

Matthew J. Siembieda
BLANK ROME LLP
siembieda@blankrome.com

Leonard D. Steinman
BLANK ROME, LLP
lsteinman@blankrome.com

Joel E. Tragesser
LOCKE REYNOLDS LLP
jtragesser@locke.com

Mark D. Wegener
HOWREY SIMON ARNOLD & WHITE
wegenerm@howrey.com

Peter S. Weissman
BLANK ROME, LLP
weissman@blankrome.com

Michael Douglas White
BLANK ROME, LLP
white@blankrome.com

Distributed via U.S. Postal Service to:

Jill Morgan Ballo
DAVIS WRIGHT TREMAINE LLP
1501 4th Ave., Ste 2600
Seattle, WA 98101-1688

5

Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CENTILLION DATA SYSTEMS, LLC.,       )
                        Plaintiff,   )
                                     )
        vs.                          )        1:04-cv-0073-LJM-WTL
                                     )
CONVERGYS CORPORATION, QWEST         )
COMMUNICATIONS INTERNATIONAL, and)
QWEST CORPORATION,                   )
                        Defendants,  )
------------------------------------------------ )
QWEST CORPORATION and QWEST          )
COMMUNICATIONS CORPORATION,          )
                        Plaintiffs,  )
                                     )
        vs.                          )
                                     )
CENTILLION DATA SYSTEMS, LLC., and   )
CTI GROUP (HOLDINGS), INC.,          )
                        Defendants.  )

## ORDER ON RENEWED MOTION TO STAY

This cause is now before the Court on defendants', Convergys Corporation, Qwest

Communications International, and Qwest Corporation (Qwest defendants collectively, "Qwest

defendants", all defendants collectively, "Defendants"), Renewed Motion to Stay these proceedings

pending a reexamination of the patent-in-suit, U.S. Patent No. 5,287,270 ("'270"). On June 13,

2005, this Court denied Defendants' previous request for a stay, but left open whether the Court

would revisit the issue later. Defendants have renewed their motion arguing that because the Patent

and Trademark Office ("PTO") granted the Qwest defendants' request for reexamination of the '270

patent, the Court should follow the weight of authority that advise that a stay of these proceedings

is appropriate. Plaintiff, Centillion Data Systems, LLC ("Centillion"), contends that the PTO's grant

a reexamination does not significantly change the core infringement issues in this cause and a stay would unduly prejudice its ability to enforce its patent.

For the following reasons, the Court **DENIES** Defendants' Renewed Motion to Stay.

## I. DISCUSSION

In its prior order the Court set forth the following factors for the grant of a motion to stay: (1) whether a stay will unduly prejudice or tactically disadvantage the non-moving party; (2) whether a stay will simplify the issues in question and streamline the trial; and (3) whether a stay will reduce the burden of litigation on the parties and the Court. *See Xerox Corp. v. 3 Com Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999) (citations omitted). The only circumstance that is different today than it was when the Qwest defendants filed their original motion to stay is that the PTO has now granted the petition for reexamination. The standard for granting such reexamination is whether there is a "substantial new question of patentability," 35 U.S.C. § 515(a), which Defendants contend puts the efficacy of this proceeding in jeopardy as the PTO may find the patent flawed. To continue this suit while the PTO makes it reexamination, Defendants argue, both the parties and the Court waste resources.

The Court finds that the balance of the factors, at this stage of the litigation, does not favor a stay. This cause has been delayed for over eighteen months because Qwest defendants fought jurisdiction in this cause. Although the Court cannot fault a party for making a legitimate challenge to jurisdiction, the transfer to this Court Qwest defendants' parallel action from the Western District of Washington, begs the question of whether or not Qwest defendants had a legitimate challenge to such jurisdiction. Moreover, the timing of Qwest defendants challenge of the '270 patent before the

2

PTO also indicates that this request for a stay may be more of a dilatory tactic than one of necessity.

The Court cannot ignore the fact that to proceed with this litigation through claim construction and a trial without the benefit of a decision on the petition for reexamination by the PTO may in fact waste resources. However, the Court sees no reason to delay discovery, particularly in light of Defendants' desire to file challenge the allegations in the complaint via a motion pursuant to Federal Rule of Civil Procedure 11. Such a motion need not wait for a decision by the PTO on reexamination.

If the parties proceed through discovery apace, and that is a question given the flurry of motions to compel that have been filed, and the case proceeds to the claim construction phase without a decision by the PTO, the Court may again reconsider its decision to deny Defendants' motion to stay. However, given the current circumstances, the Court is unwilling to issue a stay.

## II. CONCLUSION

For the foregoing reasons, the Court **DENIES** defendants', Convergys Corporation, Qwest Communications International, and Qwest Corporation, Renewed Motion to Stay.

IT IS SO ORDERED this 24th day of August, 2005.


                                        LARRY J. McKINNEY, CHIEF JUDGE
                                        United States District Court
                                        Southern District of Indiana


Distribution attached.

3

Electronically distributed to:

Vincent J. Belusko
MORRISON & FOERSTER LLP
vbelusko@mofo.com

David C. Campbell
BINGHAM MCHALE LLP
dcampbell@binghammchale.com

Hamish S. Cohen
BINGHAM MCHALE
hcohen@binghammchale.com

James Dimos
LOCKE REYNOLDS LLP
jdimos@locke.com

Hector G. Gallegos
MORRISON & FOERSTER LLP
hgallegos@mofo.com

Michael C. Greenbaum
BLANK ROME, LLP
greenbaum@blankrome.com

Edward Han
HOWREY SIMON ARNOLD & WHITE LLP
hane@howrey.com

Denise Catherine Lane-White
BLANK ROME, LLP
lane-white@blankrome.com

Grant S. Palmer
BLANK ROME, LLP
palmer@blankrome.com

Randall R. Riggs
LOCKE REYNOLDS LLP
rriggs@locke.com

James W. Riley Jr.
RILEY BENNETT & EGLOFF LLP
jriley@rbelaw.com

Hemant Keeto Sabharwal
BLANK ROME LLP
sabharwal@blankrome.com

Matthew J. Siembieda
BLANK ROME LLP
siembieda@blankrome.com

Leonard D. Steinman
BLANK ROME, LLP
lsteinman@blankrome.com

Joel E. Tragesser
LOCKE REYNOLDS LLP
jtragesser@locke.com

Mark D. Wegener
HOWREY SIMON ARNOLD & WHITE
wegenerm@howrey.com

Peter S. Weissman
BLANK ROME, LLP
weissman@blankrome.com

Michael Douglas White
BLANK ROME, LLP
white@blankrome.com

Distributed via U.S. Postal Service to:

Jill Morgan Ballo
DAVIS WRIGHT TREMAINE LLP
1501 4th Ave., Ste 2600
Seattle, WA 98101-1688

4

Exhibit 3

PTO/SB/67 (04-05)
Approved for use through 04/30/2007. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

(Also referred to as FORM PTO-1465)
## REQUEST FOR *EX PARTE* REEXAMINATION TRANSMITTAL FORM

Address to:
**Mail Stop *Ex Parte* Reexam**
**Commissioner for Patents**                          **Attorney Docket No.:**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**                        **Date:**

1. [X] This is a request for *ex parte* reexamination pursuant to 37 CFR 1.510 of patent number __5,287,270__
   issued __February 15, 1994__. The request is made by:

   [ ] patent owner.                [X] third party requester.

2. [X] The name and address of the person requesting reexamination is:

   __Gregory D. Caldwell__

   __Blakely Sokoloff Taylor & Zafman__

   __12400 Wilshire Boulevard, Seventh Floor, Los Angeles, CA  90025__

3. [X]   a.  A check in the amount of $__2,520.00__ is enclosed to cover the reexamination fee, 37 CFR 1.20(c)(1);

   [ ]   b.  The Director is hereby authorized to charge the fee as set forth in 37 CFR 1.20(c)(1)
            to Deposit Account No. _____ (submit duplicative copy for fee processing); or

   [ ]   c.  Payment by credit card. Form PTO-2038 is attached.

4. [X]   Any refund should be made by [ ] check or [X] credit to Deposit Account No. __02-2666__.
         37 CFR 1.26(c). If payment is made by credit card, refund must be to credit card account.

5. [X]   A copy of the patent to be reexamined having a double column format on one side of a separate paper is
         enclosed. 37 CFR 1.510(b)(4)

6. [ ]   CD-ROM or CD-R in duplicate, Computer Program (Appendix) or large table
         [ ] Landscape Table on CD

7. [ ]   Nucleotide and/or Amino Acid Sequence Submission
         *If applicable, items a. – c. are required.*

         a. [ ] Computer Readable Form (CRF)
         b. Specification Sequence Listing on:

              i. [ ] CD-ROM (2 copies) or CD-R (2 copies); or
              ii. [ ] paper

         c. [ ] Statements verifying identity of above copies

8. [X]   A copy of any disclaimer, certificate of correction or reexamination certificate issued in the patent is included.

9. [X]   Reexamination of claim(s) __1, 8, 47_____ is requested.

10. [X]  A copy of every patent or printed publication relied upon is submitted herewith including a listing thereof on
         Form PTO/SB/08, PTO-1449, or equivalent.

11. [ ]  An English language translation of all necessary and pertinent non-English language patents and/or printed
         publications is included.

[Page 1 of 2]

This collection of information is required by 37 CFR 1.510. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO
to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 2 hours to complete,
including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments
on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent
and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS
ADDRESS. SEND TO: Mail Stop *Ex Parte* Reexam, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/SB/57 (04-05)
Approved for use through 04/30/2007. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

12. ☒ The attached detailed request includes at least the following items:

   a. A statement identifying each substantial new question of patentability based on prior patents and printed publications. 37 CFR 1.510(b)(1)

   b. An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited art to every claim for which reexamination is requested. 37 CFR 1.510(b)(2)

13. ☐ A proposed amendment is included (only where the patent owner is the requester). 37 CFR 1.510(e)

14. ☒ a. It is certified that a copy of this request (if filed by other than the patent owner) has been served in its entirety on the patent owner as provided in 37 CFR 1.33(c).
   The name and address of the party served and the date of service are:

   **Blank Rome LLP**

   **The Watergate Building**

   **600 New Hampshire Avenue, NW., Washington DC 20037**

   Date of Service: **May 3, 2005** ; or

   ☐ b. A duplicate copy is enclosed since service on patent owner was not possible.

15. Correspondence Address: Direct all communication about the reexamination to:

☒ The address associated with Customer Number: **08791**

OR

| Firm or Individual Name | | |
|---|---|---|
| Address | | |
| City | State | Zip |
| Country | | |
| Telephone | Email | |

16. ☐ The patent is currently the subject of the following concurrent proceeding(s):
   ☐ a. Copending reissue Application No. _____
   ☐ b. Copending reexamination Control No. _____
   ☐ c. Copending Interference No. _____
   ☐ d. Copending litigation styled: _____

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

| Authorized Signature | May 3, 2005 Date | |
|---|---|---|
| **Gregory D. Caldwell** Typed/Printed Name | **39,926** Registration No. | ☐ For Patent Owner Requester ☒ For Third Party Requester |

[Page 2 of 2]



UNITED STATES PATENT AND TRADEMARK OFFICE

MCG

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,533 | 05/05/2005 | 5287270 | | 1995 |

2779      7590      06/26/2005
BLANK ROME LLP
THE WATERGATE BUILDING
600 NEW HAMPSHIRE AVENUE, NW
WASHINGTON, DC 20037

| | EXAMINER |
|---|---|
| | |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 06/26/2005

*BLANK ROME LLP*

*JUL 0 1 2005*

*RECEIVED*
*COUNSELORS AT LAW*

Please find below and/or attached an Office communication concerning this application or proceeding.

DOCKETED 0141.1
11 JUL -1 2005 KC
Noted Due 8.26.05
Action Due
Reply.

Exhibit 4

| **Order Granting / Denying Request For Ex Parte Reexamination** | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/007,533 | 5287270 |
| | Examiner | Art Unit | |
| | James S. McClellan | 3627 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>05 May 2005</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☒ PTO-892,     b)☒ PTO-1449,     c)☐ Other: _____

1. ☒    The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐    The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)). Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐ by Treasury check or,

b) ☐ by credit to Deposit Account No. _____, or

c) ☐ by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

James S. McClellan
James S McClellan
Primary Examiner
Art Unit: 3627

Exhibit 5

- **Solutions**
- **Products**
- **Relationships**    Contact    Download
- **Company**
- **News**



# Relationships: **Partners**

Partner with Avolent to build the future of tl
eBilling and Cash Flow Optimization industr
one successful Global 2000 customer at a tin

**Customers**

**Partners**

**Avolent eBilling and Cash Flow Optimization Solutions Partners**
**Partnering with Avolent: Why and How**

At Avolent, we recognize the true value of effective eBilling and Cash Flow Optimization
streamlining business processes. It's about making more mutually profitable business o
and creating better customer relationships through the automation and increased conve
all interactions related to the financial relationship between buyers and sellers.

An effective eBilling and Cash Flow Optimization front-office solution integrates and ex
financial information from a variety of mission-critical back-office systems, including ER
payment, freight & logistics and customer information systems. eBilling and Cash Flow
Optimization also complements and integrates with other front-office systems such as (
Relationship Management software and E-Commerce applications.

Hence, Avolent's success is closely tied to the success of its industry leading systems
integration, payment solutions, complementary enterprise software and technology plat
partners.

SYSTEMS INTEGRATORS











  





  

  

  

 

  

 

  

 

### Why Partner with Avolent?

Join the community of Avolent partners to work with a team of passionately engaged technologists and marketers who are building the future of the eBilling and Cash Flow Optimization industry one successful Global 2000 customer at a time.

Join the community of Avolent partners to participate in mutually profitable multi-million projects.

Join the community of Avolent partners to have immediate and lasting impact for custor

### How?

No forms to fill out.

Just call Chris Kenney, Global Director of Channels and Alliances, at 415 553 6935 or ckenney@avolent.com and describe your company and your interest in eBilling and C Optimization.

---

©2005 Avolent, Inc. All Rights Reserved. Legal Notice & Trademarks -- Privacy Policy

**UNREPORTED CASES**

## Westlaw.

Slip Copy

Page 1

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
BACUS LABORATORIES, INC., Plaintiff,
v.
APERIO TECHNOLOGIES, INC., and Dakocytomation California, Inc. d/b/a Dako Corporation, Defendants.
**No. 02 C 9073.**

March 1, 2005.

John F. Flannery, Karl Regan Fink, Michael G. Vranicar, Fitch, Even, Tabin & Flannery, Chicago, IL, for Plaintiff.
Robert A. Carson, Shannon Leiola Clark, Chicago, IL, for Defendant.

MEMORANDUM OPINION AND ORDER

KENNELLY, J.
*1 In this patent infringement suit, Bacus Laboratories, Inc. alleges that a product called ScanScope infringes U.S. Patents No. 6,272,235, 6,522,774, 6,396,941, and 6,466,690, which are held by Bacus. The case is before the Court for construction of disputed claim language in the patent-in-suit, as well as Bacus' motion for a stay of claims and counterclaims relating to the '690 patent.

Factual Background

Bacus developed, manufactures, and sells Bliss and WebSlide. Bliss is a virtual microscope that converts a traditional glass microscope slide into a format that can be viewed on a computer. WebSlide is an Internet server that provides an organized collection of digitized microscope slides that can be accessed on the Internet or an intranet network. Once on the computer, a slide is easily navigable

and can be viewed at a variety of resolutions. In addition, the slide can be shared and viewed across the Internet, which has become an important tool for medical students, doctors, and scientists.

In its complaint, Bacus alleges that ScanScope, a commercial competitor to Bliss manufactured by Aperio, infringes Bacus' patents. Specifically, Bacus argues that ScanScope uses an image scanning and storing system that operates in the same way as the system disclosed in the '235, '774, and '941 patents.

Discussion

The first step in any patent infringement case is to construe the claims of the patent-in-suit. *Mars, Inc. v. H.J. Heinz Co.,* 377 F.3d 1369, 1373 (Fed.Cir.2004). The parties submitted extensive briefs in support of their respective positions concerning how the claim language should be construed. The Court held a hearing on October 21, 2004 to further educate itself about the technology at issue. The purpose of this Memorandum Opinion and Order is to set forth the Court's construction of the disputed claim language.

The object of claim construction is to determine the meaning of terse and sometimes unfamiliar language in patent claims. *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1339 (Fed.Cir.2001). The parties in this case agree on the general principles that govern claim construction. First of all, they agree that "the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to ' particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.' 35 U.S.C. § 112, 2." *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed.Cir.2001), *quoted in Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1201-02 (Fed.Cir.2002). *See* Pl. Claim Constr.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

Mem. 8; Def. Claim Constr. Mem. 3. The parties further agree that "[t]here is a heavy presumption that the terms used in the claims have the ordinary meaning that would be attributed to those words by persons skilled in the relevant technology." Def. Claim Constr. Mem. 3; *see* Pl. Claim Constr. Mem. 8. *See, e.g., Texas Digital,* 308 F.3d at 1202; *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed.Cir.2002); *K-2 Corp. v. Salomon S.A.,* 191 F.3d 1356, 1362-63 (Fed.Cir.1999). In addition, "unless compelled otherwise, a court will give a claim term the full range of its ordinary meaning as understood by persons skilled in the relevant art." *Texas Digital,* 308 F.3d at 1202 (citing *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed.Cir.2001); *Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 989 (Fed.Cir.1999); and *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 986 (Fed.Cir.1988)).

**\*2** The parties agree that in determining the ordinary and customary meaning of a claim term, the court may consult, in addition to the claims themselves, dictionaries and treatises, *see, e.g., Texas Digital,* 308 F.3d at 1202, as well as the written description and drawings contained within the patent, as well as the prosecution history. *See, e.g., DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1324 (Fed.Cir.2001). *See* Pl. Claim Constr. Mem. 8-9; Def. Claim Constr. Mem. 3. In particular, both sides in this case have specifically agreed that "a court can and should consult dictionary definitions in construing claim terms." Def. Claim Constr. Mem. 3; *see* Pl. Claim Constr. Mem. 8-9. The parties have also specifically agreed that the presumption of ordinary meaning may be overcome if a term is used in the specification and/or the prosecution history in a way that is inconsistent with its ordinary meaning. *See* Pl. Claim Constr. Mem. 9; Def. Claim Constr. Mem. 3-4. But, as Aperio states in its claim construction memorandum, "[i]t is inappropriate ... to consult the intrinsic record to determine the meaning of claim terms before attempting to discern the ordinary and customary meanings attributed to the words themselves. To do so would violate the rule that limitations from the specification may not be imported into the claims so as to limit their scope." Def. Claim Constr. Mem. 4 (citing *Int'l Rectifier*

*Corp. v. IXYS Corp.,* 361 F.3d 1363, 1373 (Fed.Cir.2004); *Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F.3d 1270, 1277 (Fed.Cir.1995); *SRI Int'l, Inc. v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1121 n. 14 (Fed.Cir.1985) (*en banc* )). Bacus agrees. *See* Pl. Resp. to Def. Claim Constr. Mem. 2.

With these general principles in mind, the Court turns to the disputed claim terms at issue in this case.

### '235 Patent

Patent No. 6,272,235 was issued on August 7, 2001. The parties dispute eight terms in the '235 patent: image tiles; digitally scanning; data structure of images; overall macro view; virtual microscope slide; original optical image; contiguous fields of view; and reconstructing contiguous images. FN1 We discuss each in turn.

> FN1. Bacus' original proposed claim construction also contained "multiple tiled images" as a disputed term in claim twenty-three of the '235 patent. Aperio did not respond to Bacus' definition of multiple tiled images, seemingly because it agreed to Bacus' definition. The term is subsequently not mentioned in Aperio's response, Aperio's proposed claim construction; Bacus' response, or Aperio's sur-rebuttal. In its surreply, however, Bacus mentions the term again and states that "Defendants incorrectly state that the parties have agreed on the meaning of ' multiple tiled images." ' Pl. Surreply at 5. The parties should have settled this issue at an earlier date. The Court does not have any argument from Aperio on the meaning of "multiple tiled images" because Aperio believed the issue to be settled. The Court does not have enough information to address this claim and will not do so in this Memorandum.

#### 1. Claim one

Claim one of patent '235 discloses:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

A method of constructing and using a *data structure of images* from a specimen on a microscope slide using a microscope having an objective lens comprising:
*digitally scanning* and storing images from the specimen on a microscope slide to create a plurality of individual contiguous *image tiles* at a resolution finer than the optical resolution of the objective lens of the microscope and with a digital spacing between pixels finer than the optical resolution of the objective lens;
providing a control program for the data structure for viewing, manipulating and reconstructing the image tiles; and
transferring the scanned, digital image tiles over an Internet or intranet communication channel; and
*3 using the control program to allow viewing of a digital reconstructed composite image formed from contiguous image tiles of a substantially larger image area than the area of the individually acquired tiles.

### A. Image tiles

The term "image tiles" is used throughout the '235 patent. Bacus urges that this term be construed as referring to subsections or parts of an image, with " image" meaning an optical representation. Aperio's proffered definition is "an optical reproduction of a single field of view from the objective lens of a microscope, separately scanned and separately stored as a standard image file."

The first step is to determine the ordinary and customary meaning understood by those skilled in the relevant technology. It is undisputed that the ordinary meaning of image is an "optically formed duplicate, counterpart, or other representative reproduction of an object, especially an optical reproduction formed by a lens or mirror." American Heritage Dictionary 875 (Houghton Mifflin 4th ed.2000). Aperio contends, however, that the definition of image in the claim must refer to the objective lens of a microscope. As will be discussed below with regard to the rest of Aperio's proffered definition, the addition of "the objective lens of the microscope" to the definition of image departs from

the ordinary and customary meaning of image tiles and is not required by the context of the claim.

In support of its proposed definition of "tiles," Bacus cites a technical dictionary, the Dictionary of Photography and Digital Imaging. That source defines tile as a "sub-section or part of a larger bitmapped image," used for file storage purposes or image processing. Dictionary of Photography and Digital Imaging 337 (Amphoto Books 2001). Aperio argues that this definition is irrelevant because the dictionary was first published in 2002, one year after the '235 patent was issued. In *Brookhill-Wilk I, LLC v. Intuitive Surgical, Inc.,* 334 F.3d 1294, 1299 (Fed.Cir.2003), the court held that the district court improperly relied on two Internet articles that postdated the issuance of the patent by five and eight years. The court stated that the articles were "not contemporaneous with the patent, do not reflect the meanings that would have been attributed to the words in dispute by persons of ordinary skill in the art as of the grant" of the patent. *Id.* at 1299. The circumstances are different, however, in the present case. The dictionary cited by Bacus was actually copyrighted in the same year the '235 patent was issued and thus provides a contemporaneous definition of the term "tiles" that properly can be relied upon in this case. Even if one relies on the publication date rather than the copyright date, there is nothing to suggest that the definition of tiles changed in that short stretch of time. Among other things, Aperio provides no contrary contemporaneous dictionary definition of the term.

Aperio's primary argument is based on the specification and the prosecution history. In particular, Aperio relies on what it contends is a definition of "image tiles" within the specification, which states that "each of the 80 image segments will be scanned separately and stored as a separate image tile. " '235 patent, col. 11, lines 28-30; *see also id.,* line 60 ("[e]ach of the stored data image tiles is a separate image file."). These descriptions are in no way inconsistent with the ordinary meaning of the term tiles as used in the context of a digitized image; rather, they describe a particular way in which image tiles can be created. The claims, however, are not limited to the particular

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 475158 (N.D.Ill.)
(Cite as: Slip Copy)

Page 4

embodiments described in the specification. *E.g.,* *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.,* 340 F.3d 1298, 1306-07 (Fed.Cir.2003) . The specification may be used to limit the definition of a claim term if the patentee has disavowed or disclaimed the full scope of that term by using "expressions or manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Amer. Corp.,* 299 F.3d 1313, 1325 (Fed.Cir.2002). Such is not the case here. The claims use the term "image tiles" in a way consistent with its ordinary meaning to those skilled in the relevant technology.

\*4 We turn finally to the prosecution history to determine whether Bacus limited the ordinary and customary meaning of image tiles during the prosecution of the '235 patent. Aperio's contention that the scope of this claim term was limited during the prosecution of the patent is an after thought at best. Aperio did not make the argument in its opening claim construction brief or in its response to Bacus' opening brief, but rather did so only in its surrebuttal, a brief to which Bacus had no opportunity to reply. The argument was therefore forfeited.

Even were the Court not to consider Aperio's argument to have been forfeited, we would reject it. Aperio contends that Bacus limited the definition of image tiles during the prosecution when it differentiated its device from a prior art patent. One reference in the prosecution history reads:
Ishibashi, et al. starts from one large stored image of original information ... and simply breaks it down into smaller areas ... *This breaking down of one large stored image teaches nothing about how to create one large image from a series of contiguous smaller images.* It is the opposite problem. Pl.Ex. 13, '235 patent, Amendment B at 18 (emphasis added).

Another reference states:Ishibashi 4,742,588 is directed to the exact opposite of that being done in that the original information image of Ishibashi is too large to be displayed whereas the original image tiles are displayed in this invention. Moreover, these original image tiles of this invention are combined to display even a larger area than a single original

information tile image. This is the exact opposite of Ishibashi.... *That is, Ishibashi is concerned with how to break down a large area rather than how to create one large image from a series of aerial camera information.* There is no edge alignment of contiguous tiles taken at high resolution and assembled edge-to-edge to give the original high resolution for the composite image as in the present invention. Pl.Ex. 13, '235 patent, Amendment B at 17 (emphasis supplied).

Aperio argues that in these selections from the prosecution history, Bacus surrendered any construction of "image" tiles that would include " breaking down a large area," as that was how Bacus differentiated its technology from the Ishibashi patent. The Court disagrees. Bacus' statement that its technology is concerned with creating a large image from a series of images in no way limits the meaning of the term "image tiles." There is nothing in the prosecution history suggesting a clear disavowal of claim scope.

The Court therefore adopts Bacus' proposed definition of the term and construes image tiles as subsections or parts of an optical representation.

### B. Digitally scanning

Bacus' proffered definition for "digitally scanning" is successive analyzing, according to a predetermined method, of elements constituting a picture area in the form of digits. Aperio argues that the plain meaning of "digital scanning" means receiving image signals representative of a field of view from the objective lens of a microscope and converting the image signals into digital form. Again, Bacus asserts that Aperio is improperly importing limitations from the specification to the claim. According to Bacus, "of a field of view from the objective lens of a microscope" has nothing to do with the ordinary and customary meaning of digital scanning.

\*5 Bacus' proffered definition of scanning is the ordinary definition of the term. The American Heritage Dictionary (p. 1554) defines scan as:
*electronics.* To move a finely focused beam of light

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

or electrons in a systematic pattern over (a surface) in order to reproduce or sense and subsequently transmit an image; 6. *computer science* to search (stored data) systematically for specific data.

The Modern Dictionary of Electronics, 885 (6th ed.1984), defines scanning as "the successive analyzing or synthesizing, according to a predetermined method, of the light values or equivalent characteristics of elements constituting a picture area."

Aperio argues that Bacus has limited the ordinary definition of digitally scanning in the specification of the '235 patent. Aperio cites the following references:
The focusing system is programmed to step through increments which detect/select only the high resolution center area of the field of view in order to avoid storing the fuzzy areas at the periphery of the field of view. '235 patent, Col. 11, Lines 18-22.
The optical image of the desired image area is then detected by optical array sensor 19 (preferably a CCD sensor array). '235 patent, Col. 11, Lines 42-44.
The optical array sensor sends electrical signals indicative of the detected image to microscope controlled computer 32. '235 patent, Col. 11, Lines 46-48.

According to Aperio, this language shows that Bacus used "digitally scanning" to describe the process of receiving image signals from the camera sensors that look through the field of view of the objective lens of the microscope and digitizing the signals.

Bacus argues that the portion of the specification cited by Aperio relates only to the *resolution* of the digitally scanned and stored images, not to the actual process of scanning and storing the images. Furthermore, Bacus argues that Aperio is attempting to improperly limit the construction of the term to a specific embodiment found in the specification. *SRI International, Inc. v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 n. 14 (Fed.Cir.1985). Bacus also points to portions of the specification in which the term digitally scanning is used in a broader sense:

A method and apparatus are disclosed for constructing a virtual microscope slide comprised of digitally scanned images from a microscope specimen. '235 patent, Abstract.

The claim language and intrinsic evidence support Bacus' proffered construction of the term. Nothing in the claim language or the specification references cited by Aperio requires that digitally scanning be limited to "receiving image signals representative of a field of view." The Court is therefore bound to construe digitally scanning consist with its ordinary and customary meaning. *Transmatic v. Gulton Industries, Inc.*, 53 F.3d 1270, 1277 (Fed.Cir.1995). We therefore construe "digitally scanning" as successive analyzing, according to a predetermined method, of elements constituting a picture area, in the form of digits.

### C. Data structure of images

**\*6** Bacus asserts that "data structure of images" means a collection of data components of images. Aperio concedes that Bacus has provided the ordinary meaning of the term but argues that the intrinsic record reflects that Bacus has provided a narrower definition for the term. Aperio says that in the context of the claim, the only images capable of being collected in the data structure are the image tiles. Thus, to make sense in context, Aperio argues, the data structure must have mapping coordinates to allow the program to reconstruct the image tiles. Aperio's proffered definition of "data structure of images" is a collection of data components including image tiles and their mapping coordinates. The Court will consult the intrinsic record to determine whether Bacus has limited the meaning of data structure of images as Aperio contends.

The specification states:
The data structure is constructed by digitally scanning and storing the low magnification images with their mapping coordinates and likewise, digitally scanning and storing higher magnification images with the mapping coordinates. '235 patent, Col. 4, Lines 32-36.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 6

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

Once the user has completed selecting and having the computer controlled microscope system scan and store the digital images in image tiles ... along with their coordinate information and creates slide image data structure 31 in Fig. 1. Slide image data structure includes all of the bitmap image tile files at both magnifications (note that similarly, additional images could be stored at further magnifications, if desired) as well as X-Y coordinate information for the location of various image tiles. '235 patent, Col. 12, Lines 46-55.

Fig. 7A is a file listing such as would be seen under a Windows 95 file manager showing the data files included in a data structure for a breast cancer specimen. Included in the file listing are FinalSacan.ini and SlideScan.ini as well as sixty bitmap data files.... The bitmap files represent the individual image tiles in the scan at, say, 1.25 times magnifications. SlieScan.ini is set forth below in Table 1 and describes the X-Y coordinates for each image tile file. '235 patent, Col. 14, Lines 40-42.

Though these excerpts from the specification support the notion that data structure of images includes mapping coordinates, they do not go so far as to manifest an intent by Bacus exclude other embodiments of the term that would fall within the ordinary meaning. Furthermore, at least one of these references reflects that the data structure can include components other than mapping coordinates, such as various magnifications and views. *See* '235 patent, Col. 12, Lines 46-55 ("Slide image data structure includes all of the bitmap image tile files at both magnifications ... *as well as* X-Y coordinate information") (emphasis added).

Because the definition provided by Bacus is the ordinary meaning of data structure of images, and because the ordinary meaning makes sense in the context of the language of the claim, the Court accepts Bacus' definition of the term. *Transmatic,* 53 F.3d at 1277 ("In construing a claim, claim terms are given their ordinary and accustomed meaning unless examination of the specification, prosecution history, and other claims indicates that the inventor intended otherwise.")

### 2. Claim three

**\*7** Claim three of the '235 patent discloses:
displaying a first image comprising a portion of the specimen as an *overall macro view;*
displaying a second image comprising higher resolution view from the specimen on the microscope slide at a higher magnification than the magnification of the overall macro view;
selecting a point on *said overall macro image* with a marker; and
producing a corresponding higher magnification image at the location of the marker.

Bacus states that "overall macro view" means a comprehensive large scale view. Aperio does not provide a competing definition. Rather, it focuses its attack on Bacus' contention that the claim's last reference to "said overall micro image" is meant to refer back to the "overall micro view." Aperio argues that the Court must interpret "overall macro view" and "overall macro image" differently because the claim language differs, and the Court cannot rewrite the claims. To support its argument that the phrases have the same meaning, Bacus directs the Court to the first sentence of claim three, which refers to "displaying a first image comprising a portion of the specimen as an overall macro view." This, Bacus argues, links the terms "image" and "view." In addition, Bacus notes that the patent examiner did not object to the interchangeable use of "overall macro view" and "overall macro image."

The Court agrees with Bacus. The terms "overall macro view" and "overall macro image" have the same meaning-a comprehensive large scale view.

### 3. Claim thirty-three

Claim thirty-three of the '235 patent discloses:
A method for viewing a portion of or an entire virtual microscope slide having a specimen representation comprised of sets of digitized image tiles, the method comprising:
providing an Internet or intranet communication channel;
providing one or more receivers connected to the Internet or intranet communication channel to receive *virtual microscope slides* for viewing;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

storing one or more sets of virtual microscope digital slides at a first station connected to the Internet or intranet communication channel;

transmitting stored digital image tiles at a first resolution and magnification over the Internet or intranet communication channel to a receiver requesting a virtual microscope slide or portion thereof; and

providing a display of a virtual microscope slide formed from the transmitted set of digital image tiles as a composite reconstructed view formed of selected contiguous image tiles at the first resolution and magnification of the *original optical image* and

providing a display of an overall view of an area of interest of the specimen representation at a lower resolution and magnification at the requesting server.

### A. Virtual microscope slides

Bacus argues that "virtual microscope slides" should be construed to mean microscope slides simulated or carried on by means of a computer. According to Aperio, the term should be defined as denoting a data structure of images which can be used in place of the actual specimen slides.

**\*8** According to Bacus, the term "data structure of images" has nothing to do with the ordinary meaning of virtual microscope slides. And, in fact, the dictionary defines virtual, as used in computer science, as "created, simulated, or carried on by means of a computer or computer network." American Heritage Dictionary at 1922. Thus, Bacus' proposed definition is consistent with the ordinary meaning of the term. Moreover, Bacus' proffered definition fits into the context of the claim, which deals with requesting, receiving, and providing a "microscope slide" on a computer via the Internet.

Aperio argues that the ordinary meaning of "virtual microscope slide" is irrelevant to the claim construction, because Bacus acted as its own lexicographer by providing a very specific definition of the term. According to Aperio, Bacus

uses the term "virtual microscope slide" almost interchangeably with "data structure" in the specification:

A virtual microscope slide, i.e. interrelated data structures and display procedures depicting at multiple resolutions, images of a specimen on a microscope slide. '235 patent, Col. 10, Lines 57-59.

The fact that a typical microscope specimen slide contains only limited information of interest and the ability of the system embodying the invention to accurately locate such regions enables the system to create a virtual microscope slide, i.e. a data structure that can be used in place of the actual specimen slides. '235 patent, Col. 6, Lines 42-47.

By compressing the .bmp images to .jpg and adding a dynamic, self-executing program which enables the user to view, reconstruct and manipulate the image tiles, the user can use the data structure as a virtual microscope slide of the original specimen. '235 patent, Col. 19, Lines 10-14.

Bacus responds by asserting that Aperio is using the specification to define the term in place of the ordinary and general meaning of virtual microscope slides. The Court is persuaded by Bacus' argument. Unless the patentee has explicitly disclaimed or clearly disavowed the plain and ordinary meaning of the claim language, the plain and ordinary meaning defines the scope of the claim. *Housey Pharmaceuticals, Inc. v. Astrazeneca UK Ltd.,* 366 F.3d 1348, 1352 (Fed.Cir.2004). Bacus does not make in the specification an expression of manifest " exclusion or restriction, representing a clear disavowal of the claim scope." *Teleflex,* 299 F.3d at 1325. Therefore, the Court cannot read into the phrase "virtual microscope slide" limitations that are found in the specification. FN2

> FN2. Even when only one embodiment of the claim is disclosed in the specification, there is no rule that the claim terms are to be limited to the embodiment disclosed. *Teleflex,* 299 F.3d at 1326.

The Court construes "virtual microscope slides" as denoting microscope slides simulated or carried on by means of a computer.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

### B. Original optical image

Bacus defines "original optical image" as the visual source of the image of the specimens from which a copy, reproduction or translation is made. This is consistent with the ordinary meaning of the term. The dictionary defines "original" as "being the source from which a copy, reproduction, or translation is made," and the term "optical" as "of or relating to sight; visual." American Heritage Dictionary at 1241.

**\*9** Aperio defines "original optical image" as the first image tile, where "image tile" means an optical reproduction of a single field of view from the objective lens of a microscope, separately scanned and separately stored as a standard image file. Aperio concedes that Bacus has offered a definition encompassing the ordinary meaning of the term. Aperio argues, however, that in the specification, Bacus gave the term a different meaning. Def. Mem. at 19. Aperio contends that Bacus uses " original optical image" to mean an image tile, as Aperio defines it. In support of its proffered definition, Aperio relies on several portions of the specification in which Bacus describes its invention. For example:
Today it is impractical to construct an optical image sensor large enough to cover the entire image area e.g., of a specimen on a microscope slide, at the required resolution. This is because lens size and resolution/magnification issues limit the size of the field of view of magnified objects and their resulting images. '235 patent, Col. 1, Lines 20-25.

Aperio's attempt to provide a definition other than the ordinary definition of "original optical image" fails, because Aperio has not overcome the strong presumption that the ordinary meaning is the correct construction. *Middleton, Inc. v. Minnesota Mining & Mfg. Co.,* 311 F.3d 1384, 1387 (Fed.Cir.2002) (citation omitted). Bacus' proposed definition of " original optical image" fits the context of the claim. If that definition is plugged in, the claim element refers to "a composite reconstructed view formed of selected contiguous image tiles at the first resolution and magnification of the visual source of the image of the specimens from which a copy,

reproduction, or translation is made." Aperio does not provide the Court with any proper basis to disregard the ordinary meaning of the term.

### 4. Claim fifty-nine

Claim fifty-nine of the '235 patent discloses:
A method of viewing high resolution images from a specimen on a microscope slide comprising:
providing a medium with digitally stored images of contiguous fields of view of an area of interest larger than several *contiguous fields of view;*
providing high resolution images stored at a digital spacing between adjacent pixels in a specimen image plane being greater than the microscope objective lens optical resolution spacing to preserve the optical resolution for a reconstructed high resolution composite image;
providing edge alignment data for spatial reconstruction of contiguous fields of view into a reconstructed composite image larger than several contiguous fields of view; and using a control program for viewing, manipulating and *reconstructing contiguous images* to form the reconstructed composite views with the preserved high resolution.

### A. Contiguous fields of view

Bacus defines "contiguous fields of view" as images rendered by a lens system of an optical instrument abutted without any substantial overlap, where "field of view" means area in which the image is rendered by the lens. Aperio argues that " contiguous fields of view" means adjoining regions that can be seen through a lens of an optical instrument.

**\*10** The dictionary defines contiguous as "sharing an edge or boundary; touching" and field of view as "the usually circular area in which the image is rendered by the lens system of an optical instrument. " American Heritage Dictionary at 397, 656. Bacus argues that adjoining does not mean to share an edge or boundary. The dictionary, however, defines adjoining as "neighboring; contiguous." *Id.* at 21.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 9

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

The dictionary definition of abut is "to touch along a border; to border on." Merriam-Webster's Collegiate Dictionary 5 (10th Ed.1999). Thus, it appears as though there is no material difference between the word abut and the word adjoining.

In short, Bacus does not provide the Court with a reason to disregard the ordinary meaning of contiguous. Bacus has also failed to provide a reason to add "without any substantial overlap" to the ordinary meaning of contiguous. Moreover, as used in the specification, it does not appear that contiguous is meant to stand for abut *and* without any substantial overlap:

Micro image tiles can likewise be defined so they are contiguous but not substantially overlapping as would interfere with the composite image. '235 patent, Col. 27, Lines 60-63.

As for the parties' dispute over whether field of view is "rendered by" the lens or "seen through" the lens, the Court agrees with Bacus' construction. The claim states that the contiguous fields of view are " digitally stored" on hard drive so that they can be viewed on a computer screen. Therefore, the contiguous fields of view are not actually "seen" through the lens of an optical instrument, but rather are rendered through the instrument and stored on a computer.

In sum, the Court construes the phrase "contiguous fields of view" as denoting adjoining images rendered by a lens system of an optical instrument.

### B. Restructuring contiguous images

Bacus' proffered definition of "restructuring contiguous images" is rebuilding images abutted without any substantial overlap. Aperio argues that the appropriate definition of the disputed phrase is aligning adjoining image tiles on the display screen of a computer monitor, where "aligning" means orienting the image tiles according to their predetermined electromechanical points on the microscope stage where each point is assigned an (x, y) coordinate value that uniquely defines its location.

The dictionary defines reconstruct as "to construct again; rebuild," which is consistent with Bacus' proposed construction. Aperio asserts that Bacus has acted as its own lexicographer and defined reconstructing as "aligning with the X-Y coordinate information." As support for its construction, Aperio directs the Court to the specification, which states:

The X-Y coordinate information is used by the viewing and manipulation program to reconstruct the image tiles into a complete image of the specimen. '235 patent, Col. 12, Lines 8-10.

The file index.html is the listing which contains the X-Y coordinate information for these data files. This is the information that is read by the dynamic, self-executing program for viewing, reconstructing and manipulating the image tiles into the macro and micro views. '235 patent, Col. 20, Lines 44-48.

**\*11** These references from the specification do not require that the word reconstruct have anything other than its ordinary meaning. If reconstruct simply means rebuild, both cited passages from the specification would make sense. Furthermore, in the context of the claim, reconstruction of the contiguous images is done through the use of a control program ("using a control program for viewing, manipulating, and reconstructing contiguous images"). The control program uses the X-Y coordinate information. Thus, defining the term "reconstructing" to include the use of X-Y coordinate information would make the claim's reference to the control program largely superfluous.

For these reasons, "reconstructing contiguous images" is construed to mean rebuilding adjoining images.

### '774 Patent

Patent No. 6,522,774 was issued on February 18, 2003. The parties dispute two terms in the '774 patent: original microscope images and mapping coordinates.

### 1. Claim one

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 475158 (N.D.Ill.)
(Cite as: Slip Copy)

Page 10

Claim one of the '774 patent discloses:
A data structure of images taken from a specimen on a microscope slide comprising:
a series of contiguous, multiple images at a first magnification stored and useable to create an overall view of several adjacent, *original microscope images* assembled together;
the multiple images taken from at least a portion of a specimen on the slide; and the series of images providing a magnified image of the slide specimen to a viewer.

Bacus proffered meaning of "original microscope images" is images from the microscope from which representations are made. Aperio argues that the disputed phrase denotes the first image tiles. The parties' dispute focuses on the word "original." The parties rely on the same dictionary to provide the ordinary meaning of the word original. Bacus uses one dictionary meaning that defines original as "the source from which a copy, reproduction, or translation is made." American Heritage Dictionary at 1241(4). Aperio uses the meaning "preceding all others in time; first." *Id.* at 1241(1). When there is more than one potentially applicable dictionary definition of a term, the Court must decide which is consistent with the use of the term in the intrinsic record. *Texas Digital,* 308 F.3d at 1203.

Aperio argues that Bacus' construction would make the claim circular: several adjacent images from the microscope from which images are made. Furthermore, Aperio argues that Bacus' construction departs from the ordinary and customary meaning. The specification excerpts cited by Aperio to support its definition, however, are from the '235 patent, and they make no reference to "original optical images."

Bacus points out that the phrase "original microscope images" is used only once in the specification:
It will be appreciated that a host of problems need to be solved to allow Internet or intranet users to view on their respective monitors useful, low resolution, macro images and high resolution, micro images of several adjacent, original microscope images. '774 patent, Col. 3, Lines 38-42.

**\*12** Bacus' definition of the term makes sense in the context of this specification, and in the context of the claim. It is clear from the clam language that the phrase refers to the source images from which the views reproduced on the viewers' monitors are made. The source images are the images from the microscope from which representations are made. Therefore, original microscope images is construed to mean images from the microscope from which representations are made.

### 2. Claim fourteen

Claim fourteen of the '774 patent discloses:
A storage medium having digitized images of a specimen on a microscope slide comprising:
a storage medium;
a series of contiguous, multiple images at a first magnification stored and useable to create an overall view of several adjacent, original microscope images assembled together;
the first series of multiple images taken from at least a portion of a specimen on the slide;
*mapping coordinates* for assembling the series of contiguous, multiple images stored on the storage medium;
and the mapping coordinates and the series of images providing a magnified image of the slide specimen to a viewer.

Bacus argues that mapping coordinates are " numbers used to determine the position of objects relative to one another." In providing this construction of mapping coordinates, Bacus relies on the dictionary definition of map, "the correspondence of elements in one set to elements in the same set or another set," and the dictionary definition of coordinates, "any of a set of two or more numbers used to determine the position of a point, line, curve or plane in a space of given dimension with respect to a system of lines or other fixed references." American Heritage Dictionary at 1067, 404.

Aperio argues that mapping coordinates should be construed to mean "corresponding numbers used to determine the position of an object with respect to a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

fixed reference," where the fixed reference is the microscope stage. Aperio asserts that the specification supports its construction:

The system includes a microscope and stage in which digital locations on the stage have been predetermined in accordance with an electromechanical addressable coordinate system (X-Y for convenience). Each point on the stage is assigned an "X" and a "Y" coordinate which uniquely defines its location. '774 patent, Col. 5, Lines 13-17.

The signal produced by the optical sensors in the CCD grid are then transmitted to a computer which stores the image signals in a series of tiled images. Since each image frame is defined by predetermined X-Y coordinates, these can be easily converted into a series of contiguous tiled images. '774 patent, Col. 5, Lines 51-56.

Though Aperio's definition including the microscope stage as the fixed reference may make sense in the context of the specification, the definition of mapping coordinates should not be limited to microscope stages. *Teleflex*, 299 F.3d at 1328 ("We have cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.") (citation omitted).

**\*13** Bacus asserts that the definition cannot include the microscope stage because claim fourteen (as well as the entire '774 patent) contains no reference to the use of a microscope stage as a fixed reference. Elsewhere in the specification, coordinate systems are referred to in reference to bitmap coordinates, viewing screen coordinates, and coordinates on the scanning screen, and therefore, the coordinate systems should not be limited to the microscope stage. *See* Pl. Resp. at 18.

Aperio has not persuaded the Court that the term mapping coordinates should be limited to coordinates in reference to a microscope stage. The Court construes mapping coordinates as "numbers used to determine the position of objects relative to one another."

'941 Patent

Patent No. 6,396,941 was issued on May 28, 2002. Bacus and Aperio dispute three terms in the '941 patent: control information; zooming; and slide tray information.

### 1. Claim one

Claim one of the '941 patent discloses:

A method for viewing virtual microscope slides comprised of sets of digitized tiled images over a common communication channel, the method comprising:

providing a transmitting station connected to the common communication channel and accessible by a number of remote receiving stations connected to the common communication channel;

storing a plurality of sets of virtual microscope, digitized slide images at the transmitting station;

transmitting *control information* to the requesting computer for use in aligning the transmitted sets of digitized tiled images to form a composite, coherent, seamless digitized, virtual microscope, slide image from a set of digitized tiled images;

displaying on a viewer at a remote receiving station a thumbnail view of a specimen or portion thereof on the virtual microscope slide;

displaying on the viewer at the remote receiving station an aligned set of digitized tiled images at a higher resolution than the resolution of the thumbnail view; and zooming by the viewer back and forth between the thumbnail view and the higher resolution set of digitized tiled images.

Bacus defines "control information" as processed, stored, or transmitted data with the ability to manage or direct. The parties do not dispute the meaning of information. Aperio rejects Bacus' definition of "control information" because it claims that data cannot manage or direct. Bacus responds by accusing Aperio of playing "word games" and states that a person skilled in the art would understand that though data cannot directly manage or direct, it may be used to manage or direct. According to Bacus, this meaning is clear from the claim language, which states "transmitting control information to the requesting computer *for use in* aligning" (emphasis added).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 12

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

Aperio says that "control information" should be construed to mean transmitted data for use in measuring the alignment of image tiles, with "data" defined as the top left X-Y stage coordinates for a separately scanned and separately stored image tile. In support of its argument, Aperio cites the specification, which states:
*14 The computer 32 stores the scanned images, including the top left X-Y stage coordinates for each of the 80 individual areas of the microscope slide. '941 patent, Col. 6, Lines 4-7.
The X-Y coordinate information is used by the viewing and manipulation program to reconstruct the image tiles into a complete image of the specimen. '941 patent, Col. 6, Lines 33-35.

The specification does not suggest that control information must be limited to the "top left X-Y stage coordinates for a separately scanned and separately stored image tile." Claim one of the '941 patent makes sense when control information is defined simply "as processed, stored, or transmitted data with the ability to manage or direct." *See SRI,* 775 F.2d at 1121 (absent clear statements of scope in the specification, a court must follow the language of the claims, rather than that of the written description). The Court accepts Bacus' proposed construction, which is consistent with the ordinary meaning of the terms. *See* American Heritage Dictionary at 400, 899.

### 2. Claim two

Claim two of the '941 patent discloses:
A method in accordance with claim 1 further comprising:
providing a plurality of digitized tiled images each at a different resolution and each a higher resolution than the thumbnail view; and *zooming* back and forth between the plurality of higher resolution images as well as with the thumbnail image.

Bacus states that "zooming" means enlarging or reducing the size of an image. Aperio contends that the term means to cause graphics in a window or frame to appear larger on the screen. The primary

difference in the parties' definitions concerns whether "zooming" can be used to mean reducing in size as well as enlarging in size.

Aperio relies on the computer science definition of zoom: "to cause text or other graphics in a window or frame to appear larger on the screen." American Heritage Dictionary (Aperio does not provide the Court with a page cite, but the Court has confirmed the accuracy of the reference on-line). Aperio argues that the claim language demonstrates that this is the proper definition because the claim refers only to a "plurality of *higher* resolution images," which suggests that it is referring to the ability to move back in forth between images, all of which are enlarged, but are enlarged to different degrees of magnification.

"Zoom" is defined as "to enlarge or reduce the size of an image in an optical system or electronic display" in the Dictionary of Scientific and Technical Terms at 2193 (McGraw-Hill 5th ed.1994). The Webster's Dictionary definition of zoom, not cited by either party, is "to focus a camera or microscope on an object using a zoom lens so that the object's apparent distance from the observer changes-often used with in or out," which supports Bacus' proffered definition. Merriam-Webster's Collegiate Dictionary at 1377. Because dictionaries support both parties' definitions of zooming, the Court must turn to the intrinsic record to determine whether Bacus gave the term a specific meaning in context.

*15 Bacus argues that the portions of the specification cited by Aperio actually supports Bacus' construction:
This same, or an analogous method of filling in tiles for display images is used in scrolling, zooming in and out, and in retrieving tiles for the Field View window (coming from the Slide View window), and in retrieving image tiles from the server for the fixed size Java applet viewer. '941 patent, Col. 36, Lines 20-26.
So the virtual slide advantage of scrolling and zooming in and out are available on the screen. '941 patent, Col. 36, Lines 45-47.

The specification indicates that Bacus intended to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

use a broad definition of zooming in the '941 patent. This is likewise implied in the claim itself, which refers to zooming "back and forth" between the thumbnail and higher resolution images.

For these reasons, the Court construes "zooming" to mean enlarging or reducing the size of an image. *See Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1334 (Fed.Cir.2001) (holding that the term " portion" must be construed according to the broadest dictionary definition because the specification does not require a narrower interpretation); *see also, Texas Digital,* 308 F.3d at 1203 ("If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all consistent meanings.").

### 3. Claim sixty-four

Claim sixty-four of the '941 patent states:
A method of using a filing structure for organizing virtual microscope slide images to be requested by and transmitted to a requester from a server at a server station over a common carrier, comprising:
transmitting a request from a requester at a requesting station to the server station; transmitting a slide tray request to the server station; transmitting *slide tray information* from the server station to the requesting station;
displaying to the requester slide tray information comprising a list of virtual microscope slide names on a display device at the requesting station;
selecting from the slide tray information a microscope slide name to cause an image request for the selected slide to be sent to the server station; and transmitting from the server station a set of tiled digitized images comprising the slide specimen or a portion thereof for viewing on the display device at the requesting station.

Bacus' proffered meaning of the phrase "slide tray information" is data relating to a slide tray, where " information" is a collection of facts or data. Aperio's proffered definition of the term is folder names and file names of images with a corresponding URL path extension.

In this instance, neither party has provided the ordinary, dictionary meaning for the term slide tray. The dictionary defines slide as "a flat piece of glass on which an object is mounted for microscopic examination" and tray as "an open receptacle with a flat bottom and low rim for holding, carrying, or exhibiting articles." Merriam-Webster's Collegiate Dictionary at 1104, 1257. Bacus argues that in the context of the claim, "slide tray" means a virtual or computer based receptacle that stores and displays slide information. Bacus cites Figures 25 and 26 in support of this definition. These figures show a computer screen displaying a link for "slide tray" which can be clicked on to display slides.

**\*16** Aperio claims that in the specification, Bacus has given a more specific meaning to "slide tray information" which includes URL path extensions. For example:
After the Login Request has been acknowledged, the browser then sends a Slide Tray Request. The server response to this is to send the list of image names and header text, their associated file folders, and the URL path extensions depending upon various image data structure storage locations on the server. '941 patent, Col. 31, Lines 29-34.
Slide Tray Request-Sends Slide Tray Information
List of image names and URL path locations on the server, extracted folder names and header text. '941 patent, Col. 22, Table 4.

Aperio also cites a portion of the specification in which it claims Bacus disavowed any construction of slide tray information that would include a standard file structure:One of the advantages of this virtual slide tray organizational design is that the folder names are carried as part of the image data set structure. This is different from a standard file structure where the file name is created and files are moved into the created folder. In a virtual microscope slide environment, collections of slides may come from different sources, e.g., on CD-ROMs or other storage media. This method carries the file folder information with the slide. '941 patent, Col. 32, Lines 11-18.

This passage does in fact represent an expression " of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex,* 299 F.3d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 14

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

at 1325. Read together with the other citations from the specification, the Court is persuaded that Aperio's construction of the term "slide tray information," folder names and file names of images with a corresponding URL path extension, is the correct construction.

### Motion to stay claims regarding '690 patent

In July 2003, the Patent Office granted Aperio's request for *inter partes* reexamination of U.S. Patent No. 6,466,690, one of the patents at issue in this case. The request was based on Aperio's contention that there was a significant new question of patentability. As a result, Bacus has moved to stay all of the claims and counterclaims in this case that concern the '690 patent.

Bacus' claims in this case include a claim for infringement of the '690 patent. The defendants have counterclaimed for a declaratory judgment of non-infringement, invalidity, and unenforceability of the '690 patent. Aperio has also asserted counterclaims under federal antitrust and state unfair competition statutes based on Bacus' allegedly wrongful attempts to enforce the '690 patent.

Under 35 U.S.C. § 318, once an order for *inter partes* reexamination of a patent has been issued, the patent owner may obtain a stay of any pending litigation involving an issue of patentability regarding the patent, unless the court determines that a stay would not serve the interests of justice. In determining whether to grant a stay, the court considers the possible damage, hardship and inequities to the parties, and the relationship of the requested stay to the objective of simplifying the issues and the trial. *See, e.g., Wireless Spectrum Techs., Inc. v. Motorola Corp.,* No. 00 C 905, 2001 WL 32852, *1 (N.D.Ill. Jan.12, 2001).

**\*17** The Court denies the request for a stay. First of all, though the Patent Office's decision might impact in some way the issues regarding to infringement and validity of the '690 patent, it is less than clear that it would impact Aperio's antitrust and unfair competition counterclaims. Second, the Patent

Office proceeding has been pending for over eighteen months, and there is no indication that it is anywhere near conclusion. Thus the requested stay could stall for an extended period a case that is already over two years old. Third, from the Court's perspective the better course is to proceed to conclude discovery in the case, leaving open the option of revisiting the issue of a stay if and when the case approaches trial.

### Conclusion

The disputed claim terms are construed in accordance with the conclusions set forth in this Memorandum Opinion and Order. Bacus' motion for a stay [docket # 63-1] is denied. This case is set for a status hearing on March 9, 2005 at 8:30 a.m., in chambers.

N.D.Ill.,2005.
Bacus Laboratories, Inc. v. Aperio Technologies, Inc.
Slip Copy, 2005 WL 475158 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2257046 (Trial Motion, Memorandum and Affidavit) Bacus's Surreply to Defendants' Proposed Claim Construction (Aug. 13, 2004)
• 2004 WL 2257045 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendants' Proposed Claim Construction of Disputed Terms of the Asserted Claims (Aug. 02, 2004)
• 2004 WL 2257044 (Trial Motion, Memorandum and Affidavit) Plaintiff's Combined Motion to Compel Answers to Interrogatories and Memorandum in Support Thereof (Feb. 23, 2004)
• 2004 WL 2257043 (Trial Motion, Memorandum and Affidavit) Plaintiff's Combined Motion to Compel Discovery Regarding Defendants' Defense to Plaintiff's Willful Infringement Claim and Memorandum in Support Thereof (Feb. 06, 2004)
• 2003 WL 23818697 (Trial Pleading) Complaint (Dec. 13, 2003)
• 2003 WL 23818723 (Trial Motion, Memorandum and Affidavit) Bacus Laboratories, Inc.'s Reply to Dakocytomation California, Inc.'s Counterclaims (Jul. 28, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 475158 (N.D.Ill.)
**(Cite as: Slip Copy)**

• 2003 WL 23818721 (Trial Pleading) Bacus Laboratories, Inc.'s Answer to Aperio Technologies, Inc.'s Counterclaims (Jun. 13, 2003)

• 2003 WL 23818718 (Trial Pleading) First Amended Answer to Second Amended Complaint (Jun. 06, 2003)

• 2003 WL 23818715 (Trial Pleading) Answer to Second Amended Complaint (May. 27, 2003)

• 2003 WL 23818713 (Trial Pleading) Defendant Bacus Laboratories, Inc.'s Answer to Aperio Technologies, Inc.'s Complaint for Antitrust Violation, Unfair Competition, Interference With Prospective Economic Advantage, and Declaratory Relief (May. 23, 2003)

• 2003 WL 23818710 (Trial Pleading) Second Amended Complaint (May. 12, 2003)

• 2003 WL 23818708 (Trial Pleading) Answer (Apr. 07, 2003)

• 2003 WL 23818705 (Trial Pleading) First Amended Complaint (Mar. 18, 2003)

• 2003 WL 23818702 (Trial Motion, Memorandum and Affidavit) Reply in Support of Defendant's Motion to Transfer Venue (Feb. 20, 2003)

• 2003 WL 23818699 (Trial Motion, Memorandum and Affidavit) Memorandum and Points of Authorities in Support of Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or in the Alternative to Transfer Venue (Jan. 16, 2003)

• 1:02CV09073 (Docket) (Dec. 13, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                          Page 1

Slip Copy, 2005 WL 2045786 (S.D.Ind.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. Indiana,
Indianapolis Division.
CENTILLION DATA SYSTEMS, LLC., Plaintiff,
v.
CONVERGYS CORPORATION, Qwest
Communications International, and Qwest
Corporation, Defendants,
QWEST CORPORATION and Qwest
Communications Corporation, Plaintiffs,
v.
CENTILLION DATA SYSTEMS, LLC., and CTI
Group (Holdings), Inc., Defendants.
**No. 1:04-CV-0073-LJM-WTL.**

Aug. 24, 2005.

David C. Campbell, Hamish S. Cohen, Bingham
McHale LLP, Indianapolis, IN, Grant S. Palmer,
Matthew J. Siembieda, Blank Rome, LLP,
Philadelphia, PA, Michael C. Greenbaum, Peter S.
Weissman, Victor M. Wigman, Denise Catherine
Lane-White, Hemant Keeto Sabharwal, Michael
Douglas White, Blank Rome, LLP, Washington,
DC, Leonard D. Steinman, Blank Rome, LLP, New
York, NY, Mary B. Matterer, Blank Rome LLP,
Wilmington, DE, for Plaintiffs.
Edward Han, Mark D. Wegener, Matthew J. Moore,
Howrey Simon Arnold & White LLP, Washington,
DC, James Dimos, Joel E. Tragesser, Randall R.
Riggs, Locke Reynolds LLP, James W. Riley, Jr.,
Riley Bennett & Egloff LLP, Indianapolis, IN,
Hector G. Gallegos, Vincent J. Belusko, J. Manena
Bishop, Morrison & Foerster LLP, Los Angeles,
CA, Stephen J. Tan, Brown Reavis & Manning
PLlC, Andrew M. Mar, Brian G. Bodine, Davis
Wright Tremaine, Jill Morgan Ballo, Davis Wright
Tremaine LLP, Seattle, WA, for Defendants.

ORDER ON RENEWED MOTION TO STAY

MCKINNEY, Chief J.
**\*1** This cause is now before the Court on
defendants', Convergys Corporation, Qwest
Communications International, and Qwest
Corporation (Qwest defendants collectively, "Qwest
defendants", all defendants collectively, "
Defendants"), Renewed Motion to Stay these
proceedings pending a reexamination of the
patent-in-suit, U.S. Patent No. 5,287,270 (" '270").
On June 13, 2005, this Court denied Defendants'
previous request for a stay, but left open whether
the Court would revisit the issue later. Defendants
have renewed their motion arguing that because the
Patent and Trademark Office ("PTO") granted the
Qwest defendants' request for reexamination of the
'270 patent, the Court should follow the weight of
authority that advise that a stay of these proceedings
is appropriate. Plaintiff, Centillion Data Systems,
LLC ("Centillion"), contends that the PTO's grant a
reexamination does not significantly change the
core infringement issues in this cause and a stay
would unduly prejudice its ability to enforce its
patent.

For the following reasons, the Court DENIES
Defendants' Renewed Motion to Stay.

I. DISCUSSION

In its prior order the Court set forth the following
factors for the grant of a motion to stay: (1) whether
a stay will unduly prejudice or tactically
disadvantage the non-moving party; (2) whether a
stay will simplify the issues in question and
streamline the trial; and (3) whether a stay will
reduce the burden of litigation on the parties and the
Court. *See Xerox Corp. v. 3 Com Corp.,* 69
F.Supp.2d 404, 406 (W.D.N.Y.1999) (citations
omitted). The only circumstance that is different
today than it was when the Qwest defendants filed
their original motion to stay is that the PTO has now
granted the petition for reexamination. The standard
for granting such reexamination is whether there is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2

Slip Copy, 2005 WL 2045786 (S.D.Ind.)
**(Cite as: Slip Copy)**

a "substantial new question of patentability," 35 U.S.C. § 515(a), which Defendants contend puts the efficacy of this proceeding in jeopardy as the PTO may find the patent flawed. To continue this suit while the PTO makes it reexamination, Defendants argue, both the parties and the Court waste resources.

The Court finds that the balance of the factors, at this stage of the litigation, does not favor a stay. This cause has been delayed for over eighteen months because Qwest defendants fought jurisdiction in this cause. Although the Court cannot fault a party for making a legitimate challenge to jurisdiction, the transfer to this Court Qwest defendants' parallel action from the Western District of Washington, begs the question of whether or not Qwest defendants had a legitimate challenge to such jurisdiction. Moreover, the timing of Qwest defendants challenge of the '270 patent before the PTO also indicates that this request for a stay may be more of a dilatory tactic than one of necessity.

The Court cannot ignore the fact that to proceed with this litigation through claim construction and a trial without the benefit of a decision on the petition for reexamination by the PTO may in fact waste resources. However, the Court sees no reason to delay discovery, particularly in light of Defendants' desire to file challenge the allegations in the complaint via a motion pursuant to Federal Rule of Civil Procedure 11. Such a motion need not wait for a decision by the PTO on reexamination.

\*2 If the parties proceed through discovery apace, and that is a question given the flurry of motions to compel that have been filed, and the case proceeds to the claim construction phase without a decision by the PTO, the Court may again reconsider its decision to deny Defendants' motion to stay. However, given the current circumstances, the Court is unwilling to issue a stay.

## II. CONCLUSION

For the foregoing reasons, the Court DENIES defendants', Convergys Corporation, Qwest Communications International, and Qwest

Corporation, Renewed Motion to Stay.

IT IS SO ORDERED.

S.D.Ind.,2005.
Centillion Data Systems, LLC v. Convergys Corp.
Slip Copy, 2005 WL 2045786 (S.D.Ind.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2733353 (Trial Motion, Memorandum and Affidavit) Reply in Support of Supplemented Motion for Protective Order (Oct. 28, 2004)
• 2004 WL 2733348 (Trial Motion, Memorandum and Affidavit) Reply in Support of Plaintiff's Motion to Compel Jurisdictional Discovery (Oct. 21, 2004)
• 2004 WL 2733345 (Trial Motion, Memorandum and Affidavit) Response to Plaintiff's Motion to Compel and Supplement to Motion for Protective Order (Oct. 14, 2004)
• 2004 WL 2733342 (Trial Motion, Memorandum and Affidavit) Plaintiff's Brief in Support of Its Motion to Compel Jurisdictional Discovery (Sep. 29, 2004)
• 2004 WL 2733336 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Protective Order (Aug. 03, 2004)
• 2004 WL 2733337 (Trial Motion, Memorandum and Affidavit) Surreply to Defendant Convergys's Motion to Dismiss for Lack of Personal Jurisdiction (Jul. 26, 2004)
• 2004 WL 2733332 (Trial Motion, Memorandum and Affidavit) Defendant Convergys Corporation's Reply in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction (Jul. 19, 2004)
• 2004 WL 2733314 (Trial Motion, Memorandum and Affidavit) Defendant Citizens Communication Company's Brief in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction (Jul. 02, 2004)
• 2004 WL 2733318 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Qwest Corporation's Motion to Dismiss for Lack of Personal Jurisdiction (Jul. 02, 2004)
• 2004 WL 2733321 (Trial Pleading) Qwest Communications International Inc.'s Answer to Plaintiff's Second Amended Complaint and Jury Demand (Jul. 02, 2004)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 2045786 (S.D.Ind.)
**(Cite as: Slip Copy)**

• 2004 WL 2733326 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant Convergys's Motion to Dismiss for Lack of Personal Jurisdiction (Jul. 02, 2004)

• 2004 WL 2733307 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant Qwest's Motion for A More Definite Statement (Jun. 08, 2004)

• 2004 WL 2733305 (Trial Motion, Memorandum and Affidavit) Defendant Convergys Corporation's Brief in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction (Jun. 01, 2004)

• 2004 WL 2733311 (Trial Pleading) Second Amended Complaint for Patent Infringement and Demand for Jury Trial (Jun. 2004)

• 2004 WL 2733296 (Trial Pleading) Answer and Affirmative Defenses of Citizens Communications Company (May. 18, 2004)

• 2004 WL 2733275 (Trial Pleading) First Amended Complaint for Patent Infringement and Demand for Jury Trial (Feb. 25, 2004)

• 2004 WL 2733269 (Trial Pleading) Complaint for Patent Infringement and Demand for Jury Trial (Jan. 12, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 34368283 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
    United States District Court,D. Delaware.
    COGNEX CORPORATION, Plaintiff,
                    v.
NATIONAL INSTRUMENTS CORPORATION,
                Defendant.
            **No. Civ.A. 00-442-JJF.**

                June 29, 2001.

Neal C. Belgam, and Dale R. Dube, of Blank Rome
Comisky & McCauley LLP, Wilmington, Delaware,
George M. Sirilla, G. Paul Edgell, and William P.
Atkins, of Pillsbury Winthrop LLP, Washington,
D.C., for Plaintiff, of counsel.
William J. Marsden, Jr., and John T. Meli, Jr., of
Fish & Richardson P.C., Wilmington, Delaware,
Frank E. Scherkenbach, David M. Barkan, and John
V. Picone III, of Fish & Richardson P.C., Menlo
Park, California, for Defendant, of counsel.

            MEMORANDUM OPINION

FARNAN, J.
**\*1** Pending before the Court in this patent
infringement action is Cognex Corporation's Motion
To Stay Or, In The Alternative, For An Extension
Of The Deadlines In This Case (D.I.84). By its
Motion, Plaintiff, Cognex Corporation ("Cognex"),
requests a stay or, in the alternative, a three month
delay in the proceedings in this case, because it has
requested a reexamination of the patent in suit by
the United States Patent and Trademark Office ("
PTO"). By letter dated May 29, 2001, Cognex
advised the Court that the PTO granted Cognex's
request for reexamination of United States Patent
No. 5,481,712 (the " '712 Patent"). Cognex
contends that reexamination of the '712 Patent will
narrow and/or resolve the issues in this case.
Specifically, Cognex contends that if the '712 Patent
is declared unpatentable, it is likely that the patent

litigation will be dismissed. On the other hand, if
the PTO finds the '712 Patent patentable over the
prior art, Cognex contends that the PTO decision
might encourage the parties to settle this action.

Defendant, National Instruments Corporation ("
National Instruments"), opposes any stay in this
case. Specifically, National Instruments contends
that a stay would cause National Instruments severe
prejudice because: (1) the litigation schedule and
trial date would be delayed causing National
Instruments additional expense; (2) Cognex would
be able to continue to hold the specter of litigation
over National Instruments and its customers; and
(3) Cognex has already forced National Instruments
to spend over a million dollars defending itself in
this action before requesting the stay, despite the
fact that Cognex had the materials necessary to seek
reexamination earlier.

After reviewing the parties' positions with respect to
the instant motion and the applicable law, the Court
concludes that a stay and/or extension is not
warranted in this case. Accordingly, for the reasons
discussed, the Court will deny Cognex's Motion To
Stay Or, In The Alternative, For An Extension Of
The Deadlines In This Case.

                DISCUSSION

The decision to grant or deny a stay is within the
court's broad range of discretionary powers.
*Dentsply International, Inc. v. Kerr Manufacturing
Co.,* 734 F.Supp. 656, 658 (D.Del.1990) (citations
omitted). In determining whether a stay is
appropriate, the court should "weigh the competing
interests of the parties and attempt to maintain an
even balance." *Id.* In weighing the interests
involved, courts are generally guided by such
factors as (1) whether a stay would unduly prejudice
or present a clear tactical advantage to the
non-movant; (2) whether a stay will simplify the
issues raised by the parties; and (3) whether

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 2

Not Reported in F.Supp.2d, 2001 WL 34368283 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

discovery is complete and a trial date has been set. *Gioello Enterprises Ltd. v. Mattel, Inc.,* 2001 WL 125340 (D.Del. Jan.29, 2001); *United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991). In balancing these factors, courts must be particularly mindful of the consequences of the stay on other parties. *Dentsply International,* 734 F.Supp. at 658 (recognizing that Court must consider whether "there is 'even a fair possibility' that the stay would work damage on another party") (citations omitted). Where a stay will forestall the trial date agreed upon by the parties, this Court has required the party requesting the stay to "make a showing of 'a clear case of hardship or inequity' before the Court can enter a stay order." *Id.* (citing *Gold v. Johns-Manville Sales Corp.,* 723 F.2d 1068, 1076 (3d Cir.1983)).

**\*2** In this case, discovery was scheduled to close on May 4, 2001, less than three weeks before Cognex filed the instant Motion To Stay, and trial is scheduled for October 23, 2001. FN1 Accordingly, Cognex must demonstrate a clear case of hardship or inequity before the Court will enter an order staying this action.

> FN1. Although discovery has since been extended until July 2001 by stipulation between the parties (D.I.106), the trial date in this case has not been changed.

After reviewing the parties' arguments, the Court concludes that Cognex cannot demonstrate a clear case of hardship or inequity, and that National Instruments would be prejudiced if the Court were to grant a stay in this case. Cognex primarily contends that reexamination will simplify the issues in this case such that the litigation may be settled or dismissed and the parties' expenses significantly reduced. However, as National Instruments points out, Cognex's complaint alleges a variety of claims which are not linked to the patent infringement claim, including claims of copyright and trademark infringement and unfair competition, all of which will require a trial.

In addition, Cognex contends that the reexamination may result in changed claims, which would cause

this action to be litigated twice, wasting the Court's and the parties' resources. However, the Court is unpersuaded by Cognex's contention. The trial in this case is scheduled for October 2001, and the PTO granted Cognex's request for reexamination in May 2001. Although Cognex disputes the figures provided by National Instruments concerning the pendency of applications in the PTO because National Instruments relies on original applications rather than reexamination applications, even Cognex's figures suggest that the median reexamination time is 16 months. Thus, given the current time tables for action in the PTO, the Court believes that the trial in this case will likely be completed prior to any action by the PTO. (D.I. 87 at Exh. G; D.I. 94, Exh. D).

Further, any hardship incurred by Cognex as a result of its request for reexamination is, in part, a result of Cognex's own making. National Instruments contends and Cognex has not disputed, that Cognex has had at least some of the documents it presented to the PTO in its request for reexamination for quite some time. National Instruments identified specific prior art references in its Answer to the Complaint in June 2000, yet Cognex waited until six months before the scheduled trial date in this case to seek reexamination of the '712 Patent. FN2 Accordingly, the Court cannot conclude that Cognex has demonstrated a clear case of hardship or inequity justifying a stay in this case. *Dentsply,* 734 F.Supp. at 659 ("The Court will not elevate [a party's] failure to address its concerns in a timely fashion to an example of hardship warranting a stay."); *see also Remington Arms Company, Inc. v. Modern Muzzleloading, Inc.,* 1998 WL 1037920 (D.N.C. Dec.17, 1998) (denying stay where trial date set and defendant's delay in requesting reexamination with PTO was unjustified given that defendant knew of the prior art forming its request for reexamination well prior to its reexamination request).

> FN2. Although Cognex contends that National Instruments did not produce many of these documents until much later, National Instruments also contends and Cognex has not disputed, that some of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2001 WL 34368283 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

documents Cognex presented to the PTO were in Cognex's possession as early as 1990, well before the inception of this litigation. Thus, it appears to the Court that Cognex still could have filed its request for reexamination at an earlier date.

\*3 Moreover, given the late stage of Cognex's request, the Court finds that any delay in the trial date scheduled for this case would severely prejudice National Instruments. The parties have conducted extensive discovery in Delaware, California, Texas, Washington, D.C. and Massachusetts based on a schedule coinciding with the October 23 trial date. National Instruments has scheduled its experts and made trial support accommodations in Delaware based upon the October 23 trial date. Any deviation from the October trial date at this late stage in the litigation would necessarily prejudice National Instruments. *See Wayne Automation Corp. v. R.A. Pearson Co.,* 782 F.Supp. 516 (E.D.Wash.1991) (denying plaintiff's motion for stay where parties conducted extensive discovery and trial date was set). Accordingly the Court will deny Cognex's request for a stay.

As for Cognex's request for alternative relief in the form of a three month extension, the Court notes that the discovery deadlines in this case have been extended by stipulation of the parties. This scheduling extension should address Cognex's time concerns without necessitating a change in the October 2001 trial date. Accordingly, at this time, the Court will deny Cognex's request for a three month extension.

### CONCLUSION

For the reasons discussed, Cognex Corporation's Motion To Stay Or, In The Alternative, For An Extension Of The Deadlines In This Case will be denied.

An appropriate Order will be entered.

D.Del.,2001.
Cognex Corp. v. National Instruments Corp.

Not Reported in F.Supp.2d, 2001 WL 34368283 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00442 (Docket) (May. 02, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.

Page 1

Not Reported in F.Supp., 1990 WL 37217 (N.D.Ill.), 15 U.S.P.Q.2d 1319
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents

United States District Court, N.D. Illinois, Eastern
Division.
ENPROTECH CORP., Plaintiff,
v.
AUTOTECH CORPORATION, Defendant.
**No. 88 C 4853.**

March 16, 1990.

MEMORANDUM AND ORDER

MORAN, District Judge.
*1 Defendant has patents disclosing and claiming a
resolver, which detects the position of a rotating
shaft, with related decoding electronics. Plaintiff
markets a position-sensor with related decoding
electronics, and defendant has claimed that
plaintiff's devices infringe the patents. Plaintiff
brought this declaratory action in June, 1988,
asserting    invalidity    and    noninfringement.
Discovery proceeded, and by late in the fall the
parties were anticipating only limited further
discovery and, thereafter, a relatively short trial.
On January 18, 1990, the new discovery cutoff date
was set for March 20, with the final pretrial order to
be filed April 18 and trial set for May 7.

That further discovery, however, apparently came
up with some surprises. In any event, on January
31, 1990, plaintiff obtained leave to file an
amended    complaint    which    squarely    raised
inequitable conduct in the Patent Office claims and,
according to plaintiff, entitled it to attorneys' fees.
That same day the defendant asked for a pretrial
conference to discuss a possible stay while
defendant pursued a reexamination in the Patent
Office. That course of action was discussed at a
pretrial conference on February 22 and led to
further filings on March 5, which had been
requested by the court.

The allegations respecting inequitable conduct in
the Patent Office relate to a device which,
according to plaintiff, was known to the inventor, was material
prior art, and was deliberately not disclosed by the
inventor to his attorney or to the Patent Office.
The reexamination will, presumably, consider that
device, as well as various other United States and
foreign references, as prior art. It will not,
however, determine the inequitable conduct claim
pending here. The process will take, optimistically
(we presume that defendant would take an
optimistic view of the potential chronology), six to
nine months. The result may be a confirmation of
claims, perhaps in amended form, or it may result in
cancellation.

Plaintiff emphasizes that it has little opportunity to
participate and the Patent Office is restricted in the
information upon which it relies during the
reexamination process. Both concerns are real,
although we point out that the original issuance,
which created a presumption of validity, was the
result of an *ex parte* and circumscribed procedure.

More compelling is plaintiff's contention that the
reexamination will not resolve everything. If the
claims were cancelled it might end it all-if there
were no longer any threat of a claim of infringement
it is questionable whether plaintiff could continue
this action solely to establish that it was an
exceptional case. But if any of the claims survived
we would be right back here to litigate the claim
that the patent should not be enforced because of
inequitable conduct in the Patent Office. Most
compelling, however, is the fact that discovery here
is almost completed and the case is set for trial.
Plaintiff's customers apparently are advised that
defendant contends that plaintiff is infringing;
plaintiff wants to have the matter resolved.

*2 We are too far along the road to justify halting
the journey while the defendant explores an
alternate route. The motion to stay is denied.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 2

Not Reported in F.Supp., 1990 WL 37217 (N.D.Ill.), 15 U.S.P.Q.2d 1319
**(Cite as: Not Reported in F.Supp.)**

N.D.Ill.,1990.
Enprotech Corp. v. Autotech Corp.
Not Reported in F.Supp., 1990 WL 37217
(N.D.Ill.), 15 U.S.P.Q.2d 1319

Briefs and Other Related Documents (Back to top)

• 1:88cv04853 (Docket) (Jun. 06, 1988)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
PEGASUS DEVELOPMENT CORPORATION
and Personalized Media Communications, L.L.C.,
Plaintiffs
v.
DIRECTV, INC., Hughes Electronics Corporation,
Thompson Consumer Electronics, Inc., and Philips
Electronics North America Corporation, Defendants.
**No. Civ.A. 00-1020-GMS.**

May 14, 2003.

MEMORANDUM AND ORDER

SLEET, J.
*1 AND RELATED COUNTERCLAIMS

I. INTRODUCTION

On December 4, 2000, Pegasus Development
Corporation ("Pegasus") and Personalized Media
Communications, L.L.C. ("PMC") filed a complaint
against several defendants, alleging infringement of
six patents, including U.S. Patent Nos. 4,965,825 ("
the '825 patent") and 5,335,277 ("the '277 patent").
Since that time, the original scheduling order has
been revised several times. Currently, fact discovery
is scheduled to close on August 22, 2003, and a trial
is scheduled for February of 2004.

On February 4, 2003 and March 14, 2003,
respectively, the defendant Thomson Consumer
Electronics, Inc. ("Thomson") filed with the Patent
and Trademark Office ("PTO") a request for *ex
parte* reexaminations of the '825 and '277 patents.
The request for reexamination of the '825 patent
was granted on April 10, 2003. FN1 Presently
before the court is a joint motion by the defendants
to stay the litigation pending the completion of the

patent reexaminations (D.I.459). After careful
consideration of the parties' submissions, and for
the reasons detailed below, the court will grant the
motion.

> FN1. The court is not yet aware of a
> decision by the PTO regarding
> reexamination of the '277 patent.

II. DISCUSSION

The decision to stay a case is firmly within the
discretion of the court. *Cost Bros., Inc. v. Travelers
Indem. Co.,* 760 F.2d 58, 60 (3d Cir.1985). This
authority applies equally to patent cases in which a
reexamination by the PTO has been requested.
*Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27
(Fed.Cir.1988) ("Courts have inherent power to
manage their dockets and stay proceedings,
including the authority to order a stay pending
conclusion of a PTO reexamination.") (internal
citation omitted); *see also Emhart Indus. v. Sankyo
Seiki Mfg.,* 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987)
("[I]n passing the legislation establishing the
reexamination proceeding, Congress stated its
approval of district courts liberally granting stays
within their discretion."); *Gould v. Control Laser
Corp.,* 705 F.2d 1340, 1342 (Fed.Cir.1983) (citing
legislative history of reexamination statute). In
determining whether a stay is appropriate, the court
is guided by the following factors: "(1) whether a
stay would unduly prejudice or present a clear
tactical disadvantage to the non-moving party; (2)
whether a stay will simplify the issues in question
and trial of the case; and (3) whether discovery is
complete and whether a trial date has been set."
*Xerox Corp v. 3 Comm Corp.,* 69 F.Supp.2d 404,
406 (W.D.N.Y.1999) (citing cases); *cf. United
Sweetner USA, Inc. v. Nutrasweet Co.,* 766 F.Supp.
212, 217 (D.Del.1991) (stating a similar test).

In this case, there are two plaintiffs, four
defendants, and several counter claimants, as well

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

as six patents comprising dozens of claims. In addition, the written submissions in this case have been particularly voluminous; the briefing on claim construction alone, for example, constitutes 576 pages. *See* Report and Recommendation of Special Master Regarding Claim Construction at 2 (citing " copious briefing"). In these ways, the present suit is quite complex, although, perhaps, not extraordinarily so. The greater context of this suit is extraordinary, however: the plaintiffs have filed more than 300 related patent applications based upon an original patent application filed in 1981 and supplemented in 1987. Together, these applications contain an estimated 10,000 claims. Furthermore, as observed by the Special Master appointed in this case, the 1987 application alone constitutes over 300 columns of patent text and "is, by any measure, an extremely complex document." *Id.* at 2. These related applications may become relevant to the present case in respect to several issues including claim construction, enablement, adequacy of written description, indefiniteness, and inequitable conduct. *See id.* at 21. Thus, in this case, more than many, the court would benefit from a narrowing of the issues.

**\*2** The reexamination process will serve this purpose. For example, the court will gain the benefit of the PTO's particular expertise, in that all prior art presented to the court will have been first considered by that agency. *See Braintree Laboratories, Inc. v. Nephron-Tech, Inc.,* 1997 WL 94237, at \*9 (D.Kan.1997); *Hamilton Indus., Inc. v. Midwest Folding Products Mfg.,* 1990 WL 37642, at \*1-2 (N.D.Ill.1990). Other potential efficiencies resulting from the reexamination process are numerous: (1) many discovery problems relating to the prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial, reducing the complexity and length of the litigation; (3) the issues, defenses, and evidence will be more easily limited in pre-trial conferences following a reexamination; (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court; and (5) if the patent is declared invalid, the suit likely will be dismissed as to that patent. *Id.* These efficiencies will result in a reduced cost of litigation for the parties and more effective utilization of the limited

resources of the court. *Id.*

Thus, a stay may result in a simplification or reduction of issues for the court's consideration, or it may dispense with the litigation entirely. These are considerable economies indeed, particularly in this case. Given the involved prosecution history of the various patents-in-suit and hundreds of related patents, the number of claim terms at issue, the inordinate amount of prior art references, and the PTO's conclusion that all of the challenged claims warrant reexamination, the court finds particular merit in permitting an additional layer of review by the PTO before expending further judicial resources. *See Digital Magnetic Systems, Inc. v. Ainsley,* 213 U.S.P.Q. 290, 290 (W.D.Okla.1982) (" Congress enacted the reexamination procedure to provide an inexpensive, expedient means of determining patent validity which, if available and practical, should be deferred to by the courts."); *Softview Computer Products Corp. v. Haworth, Inc.,* 2000 WL 1134471, at \*3 (S.D.N.Y.2000) ("[T]he grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims."). Furthermore, the court notes that discovery is not complete, and the trial, although scheduled, is some nine months in the future. In light of all these factors, and considering that the reexamination process will proceed "with special dispatch," 35 U.S.C. 305, the court concludes that a stay is the most compelling alternative.

The court recognizes that a stay will cause further delay in a case that has suffered several delays already, as well as considerable distress to the plaintiffs. The court is sensitive to the plaintiffs' right to have their day in court. Nonetheless, for the reasons already mentioned, the court is convinced that a stay is appropriate in this particular case. In addition, the court reminds the plaintiffs that they affirmatively invoked the rights of the patent statute; they can hardly be heard now to complain of the rights afforded others by that same statutory framework. Thomson is legally entitled to invoke the reexamination mechanism, and the PTO has determined that reexamination is warranted. There is nothing facially untoward in that. Moreover, the court notes that if, after reexamination, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3

Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

plaintiffs' patents are again upheld, the plaintiffs' rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.,* 807 F.2d 955, 961 (Fed.Cir.1986) (holding that upon reissue, the burden of proving invalidity is 'made heavier') (quoting *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985)). In this light, and given the particular circumstances of this case, the court cannot find that the prejudice to the plaintiffs is undue.

**\*3** Objecting to a stay, the plaintiffs also have complained of dilatory conduct by the defendants, who, in turn, have accused the plaintiffs of "burying " the PTO in claims and prior art references. *See, e.g.,* Mem. of Plaintiffs in Opp. to Defs.' Joint Motion to Stay (D.I.488) at 5-22 (detailing ways in which the defendants allegedly "have repeatedly acted to complicate and delay the resolution of this litigation"); Defs.' Joint Brief in Support of Motion to Stay (D.I.460) at 4 ("Many of the Harvey patents had vast numbers of cited prior art references of record, effectively burying the most relevant ones.") and 7 ("[I]t appears that PMC sought to 'overwhelm ' the PTO and the Courts.").

As a brief response to the accusation of dilatory conduct, the court notes that Thomson's request for reexamination of the '825 patent comprised 2,610 pages; its request regarding the '277 patent totaled 4,736 pages. It is presumed that such an effort requires an enormous expenditure of time and other resources; thus, the timing of Thomson's reexamination requests does not, necessarily, reflect undue delay. Furthermore, as noted above, Thomson was legally entitled to invoke the reexamination procedure when it did. As to the defendants' repeated complaint that the plaintiffs overwhelmed the PTO with prior art references during prosecution of the patents-in-suit, the implications of such alleged conduct will be explored at another time in the litigation, if necessary. At this stage in the process, the court is satisfied that the PTO has found "substantial new questions of patentability" raised by each of the cited references, and has determined that all of the challenged claims of the '825 patent necessitate a

reexamination. *See* PTO's Decision Granting Reexamination, Supp. Appendix to Defs.' Joint Brief in Support of Motion to Stay (D.I.467) at 138. Although the court regrets a further delay in the present case, it is confident that the advantages of a stay outweigh the costs.

### III. CONCLUSION

Because the PTO's reexamination of one or more of the patents-in-suit may materially affect the issues in this case, the court will grant the defendants' motion to stay. The case is stayed pending a disposition of the PTO's reexamination of patent '825, and will be stayed pending reexamination of the '277 patent, if applicable. All pending motions will be denied without prejudice; the parties may refile them following the stay and upon the entry of a new scheduling order, if applicable.

Thus, for the aforementioned reasons, IT IS HEREBY ORDERED that:
1. The defendants' Motion to Stay Pending Reexamination by the U .S. Patent and Trademark Office (D.I.459) is GRANTED. The proceedings are stayed from the date of this order until further notice.
2. The parties shall advise the court of any decision that results from the PTO's reexamination of the '825 patent, and any other decision of the PTO regarding reexamination of any of the other patents-in-suit.
**\*4** 3. The plaintiffs' Motion for Leave to Assert Claim 15 of U.S. Patent 4,965,825 (D.I.399) is DENIED without prejudice.
4. Thomson's Motion to Dismiss or in the Alternative for Summary Judgment (D.I.376) is DENIED without prejudice.
5. Phillips' Motion to Dismiss for Lack of Standing (D.I.396) is DENIED without prejudice.

D.Del.,2003.
Pegasus Development Corp. v. Directv, Inc.
Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)

Briefs and Other Related Documents (Back to top)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

• 1:00cv01020 (Docket) (Dec. 04, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that copies of the foregoing **Centillion Data Systems, LLC's Answering Brief in Opposition to Avalent, Inc.'s Motion to Stay Action Pending Reexamination of the '270 Patent** were served this 23rd day of November, 2005 upon the following counsel of record, in the manner indicated:

**By CM/ECF and Hand Delivery:**

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899

**By CM/ECF and Federal Express:**

A. James Isbester, Esquire
Isbester & Associates LLP
3160 College Ave., Suite 203
Berkeley, CA 94705

Michelle A. Bimson
DSBA No. 4381